## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

THE CITY OF DETROIT,

     Plaintiff,                  Case No.

v.

UNITED STATES DEPARTMENT
OF COMMERCE, and GINA M.
RAIMONDO, in her official capacity
as Secretary of Commerce; and
UNITED STATES CENSUS
BUREAU, an agency within the
United States Department of
Commerce, and ROBERT L.
SANTOS, in his official capacity as
Director of the United States Census
Bureau,

     Defendants.

_____/

## THE CITY OF DETROIT'S COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

NOW COMES Plaintiff, the City of Detroit ("Detroit" or the "City"), by and through its attorneys, Fink Bressack and the City of Detroit Law Department, and for its Complaint, states as follows:

## INTRODUCTION

1.    Each year after a decennial census the Census Bureau is statutorily required to produce a "current, comprehensive, and reliable" estimate of the

population of every state, county, and city in the United States with a population of fifty thousand or more. 13 U.S.C. § 181(a).

2.     It is critical that the Census Bureau's estimates be current, comprehensive, and reliable, whether for the state of California, a county in Texas, or the City of Detroit. The Census Bureau must have a reliable process for estimating the population of *all* communities across the country.

3.     Hundreds of billions of dollars of federal and state appropriations depend on the accuracy of the Census Bureau's annual population estimates. Those estimates also send important messages about the growth or decline of communities—messages that drive business investment and community development.

4.     Unfortunately, instead of developing methods that produce "current, comprehensive, and reliable data" for all cities, the Census Bureau has adopted irrational "one size fits all" policies which have resulted in inaccurate population estimates, with a particularly harsh impact on the City of Detroit. This lawsuit seeks to correct the injustices that result from those arbitrary and capricious actions.

5.     The Census Bureau uses one inflexible formula for estimating the populations of all cities, based primarily on the number of "housing units."[1] That

---

[1] The formula also incorporates a factor for changes in the population of group quarters, a factor which is not affected by the number of housing units in a community.

formula ignores a fundamental truth about population estimates in America: the nature of housing units in older urban cities is dramatically different than the nature of housing units in newer, more affluent areas. Counting all cities the same way is inherently discriminatory.

6.      The Census Bureau's inflexible formula systematically discriminates against older and poorer communities, which are largely populated by African American and Hispanic residents, in two critical ways: (1) the formula assumes that every demolition of a vacant, uninhabitable structure represents the loss of a household and (2) the formula ignores every family that renovates an uninhabitable house and moves into the City.

7.      The combined impact of these two policies guarantees that poor and minority communities like Detroit will be undercounted in the Census Bureau's annual estimate every year.

8.      As a result of the Census Bureau's irrational and discriminatory policies, tens of thousands of Detroiters were excluded from the Bureau's Vintage 2021 and Vintage 2022 estimates of the City's population.[2]

9.      On August 16, 2023, after a year's delay imposed by the Census Bureau, the City brought an administrative challenge to the 2021 and 2022

---

[2] Annual population estimates for cities are typically released in the calendar year following the year for which the population is estimated, referred to by the Census Bureau as the "Vintage".

population estimates, presenting incontrovertible evidence that the Bureau's estimates had understated the City's population.

10.     More than six months later, on February 26, 2024, the Census Bureau finally responded to Detroit's administrative challenge, and while the Bureau made certain adjustments to its original estimates—increasing the City's population estimate by 2,470 for 2021 and by 5,185 for 2022—those figures still woefully understate Detroit's population.

11.     The Census Bureau's estimates are fundamentally flawed because the Bureau fails to take into consideration the differences between our nation's older cities and newer, more affluent, areas, using arbitrary, irrational and discriminatory methods to calculate the City's population.

12.     To estimate a city's population, the Bureau first determines the number of housing units in that city and then multiplies that number by the average number of people per housing unit (as determined in the prior decennial census). When determining the number of housing units, the Bureau starts with the number of units counted in the decennial census, then, for each subsequent year being estimated, adds new units and subtracts lost units.

13.     The Bureau makes three critical errors in deriving its annual estimate of inhabitable housing units in Detroit:

a. First, the Bureau treats the demolition of vacant, uninhabitable buildings as lost housing units, and for each demolished structure the Bureau subtracts 2.0249 Detroit residents from its population estimate;

b. Second, the Bureau refuses to include new housing units in its estimate if those new units are the product of construction or renovation for which the City of Detroit did not issue a permit; and

c. Third, after arriving at its estimate of Detroit's population based on the number of housing units in the City, the Bureau then *subtracts* people from the count so that the population fits within an arbitrary "County Cap," that reduction in the population estimate is not based upon any reduction in Detroit's population, but, instead, arises from the loss in population in other Wayne County cities or from the Census Bureau's failure to accurately estimate the population of Wayne County.

14.     These errors, which have a discriminatory impact on Detroit and its residents, are entirely avoidable and directly contravene instructions from Congress. Indeed, the circumstance under which communities like Detroit are undercounted gave rise to a Congressional directive accompanying the Commerce Department's Fiscal Year 2023 appropriation that "the Census Bureau should consider more

flexible methodologies and broader use of administrative data to ensure meaningful opportunities to improve the accuracy of the [population] estimates."

15.     Contrary to the clear direction from Congress, the Bureau has refused to adopt a flexible methodology to account for differences in the housing stock of Detroit and cities in the Sun Belt. And, the Bureau has refused to accept the reliable and verifiable administrative data submitted by Detroit in its challenge to the 2021 and 2022 population estimates.

16.     The Census Bureau has also failed to meet its statutory obligation, codified at 13 U.S.C. § 181(a), to adopt methods that will produce "current, comprehensive, and reliable data."

**Treating Demolition of Uninhabitable Buildings as Population Loss**

17.     The City of Detroit has undertaken an historic demolition program that, since 2014, has successfully removed thousands of vacant, uninhabitable structures, improving Detroit's neighborhoods and promoting growth.

18.     The Census Bureau's method of estimating population assumes that every demolished structure was inhabitable before its demolition—an assumption that might make sense in wealthy communities. For older cities, that assumption ignores the reality that uninhabitable structures are demolished in order to promote growth.  With its inflexible formula, the Census Bureau has arbitrarily decided that every housing unit that is physically lost was actually inhabitable at the time of its

destruction. The Census Bureau then reduces the community's population estimate as if a family had moved out.

19.     Because of the Census Bureau's decision to act as though these uninhabitable structures were occupied, the Bureau's estimates of Detroit's population are *decreased* for every vacant, uninhabitable house that is demolished.

20.     Detroit demolished more than 4,000 uninhabitable, abandoned homes in 2021 and 2022. Incredibly, the Census Bureau population estimates counted this as a net population loss of more than 8,000 people.

21.     In its response to Detroit's administrative challenge, the Bureau rejected the City's evidence that the population estimates overstated housing unit loss, writing that the demolition of "both occupied and vacant units are counted" as housing unit loss, which, in turn, decreases the City's population estimate.

22.     This policy is discriminatory, arbitrary and capricious: it makes no sense to assume that the demolition of uninhabitable, blighted structures—a program that is helping to spark new growth in Detroit's neighborhoods—results in the loss of population.

23.     It is hard to imagine a formula that could be more discriminatory against older urban and minority communities than one that cuts population estimates and corresponding federal funding every time a blighted, uninhabitable house is removed.

**Refusal to Count Construction When No Building Permit Was Issued**

24.     The Census Bureau rejected evidence submitted by the City showing that the number of housing units increased year-over-year due to construction that was completed without a building permit or other formal City approval.

25.     The Census Bureau's formula is built on the assumption that the only way to increase the housing stock (and, hence, to increase the number of households to estimate) is through newly-constructed houses; thus, the estimate of population increases begins by counting newly-permitted housing units. Again, in a wealthy community with virtually no abandoned homes, this makes sense: the most common way to get a new housing unit in those communities is to build it from scratch, so counting new building permits in those cities may create an accurate estimate of the increase in the inhabitable housing stock. But it makes no sense in Detroit.

26.     In an older city like Detroit, with thousands of abandoned and uninhabitable buildings, this formula is fundamentally discriminatory. New families moving to Detroit are unlikely to build a new housing unit from scratch: there are thousands of vacant, uninhabitable buildings that can be renovated more cost-effectively—and these renovations are frequently done without a formal permit. Estimating the increase in housing stock based upon new permits alone misses thousands of newly-inhabitable houses.

27.    While the Bureau's response to Detroit's administrative challenge credited the City for evidence it submitted regarding *permitted* construction that had not been included in the Bureau's original 2021 and 2022 population estimates, the Bureau rejected data from reliable sources including the U.S. Postal Service and local utility providers showing that the City's housing stock increased by more homes than the number reflected in new building permits and other formal City approvals.

28.    The Bureau's rejection of this evidence is arbitrary and capricious: in creating annual population estimates, the Census Bureau should be pursuing every opportunity to get the housing unit count right. There is no rational basis for the Bureau's decision to reject reliable administrative data showing an increase in the number of housing units in Detroit, a decision which disproportionately punishes older cities.

29.    The Bureau's refusal to accept evidence of population increases from data provided by the U.S. Postal Service and public utilities is a blatant rejection of the Congressional direction to "consider more flexible methodologies and broader use of administrative data to ensure meaningful opportunities to improve the accuracy of the [population] estimates."

**Reducing Detroit's Population with an Arbitrary County Cap**

30.     Further compounding the undercount, after arriving at an initial estimate of Detroit's population based on the number of housing units in the City, the Census Bureau then *subtracts* people from the count so that the population fits under an arbitrary "County Control" or "County Cap."

31.     As detailed in the Bureau's methodology statements, the County Cap rule requires that the cumulative population of all towns and cities within a county cannot exceed the county's population estimate, even when reliable, verifiable evidence shows that the population of a city—like Detroit—is increasing.

32.     The County Cap punished Detroit by reducing its population estimate by 7,192 people for 2021 and by 13,407 people for 2022.

33.     The County Cap rule has a disproportionate and discriminatory impact on Detroit's Black and Hispanic residents because no matter how much compelling evidence the City amasses showing that its population grew, any increase is offset when Wayne County records suggest a decline in the overall County population or when the Census Bureau underestimates the population of Wayne County, even if that decline occurred among less racially diverse areas outside of Detroit.

34.     Like the Census Bureau's other irrational and inflexible policies, the County Cap rule violates the Bureau's statutory mandate to "produce current, comprehensive, and reliable data."

**The City is Harmed by the Census Bureau's Undercount of its Population**

35.     As Detroit knocks down 60 vacant, uninhabitable houses every week, the Census Bureau reduces Detroit's population estimate by 120 people, notwithstanding the fact that these houses were abandoned and uninhabitable, and their demolition paves the way for growth. At the same time, as thousands of uninhabitable properties are renovated without a building permit the Census Bureau does not recognize this clear evidence of increasing population in the City.

36.     With each year's release of inaccurate population estimates, the Census Bureau's flawed and discriminatory methodology causes the City more harm.

37.     The Bureau's failure to consider evidence of its inaccurate 2021 and 2022 estimates costs the City and its residents hundreds of millions of dollars of federal and state funding, while threatening the City's historic turnaround by advancing the false narrative that Detroit is losing population.

38.     The Census Bureau's refusal to accept evidence that its 2021 and 2022 estimates of Detroit's population are wrong perpetuates racial inequality and disproportionately harms Detroit and its communities of color.

**The Harm to the City is Exacerbated by the Census Bureau's Delays**

39.     The harm suffered by the City has been compounded by the Census Bureau's delay in addressing the problem. The Bureau first adopted a rule suspending challenges to population estimates during the decennial census,

promising that those challenges would resume for the Vintage 2021 population estimates. Then, in 2021, the Bureau, without formal rule promulgation, adopted a new rule, again delaying all challenges to population estimates until 2023.

40.     Rather than accepting Detroit's challenge to the Vintage 2021 estimate when that estimate was first released, the Bureau forced Detroit to wait another year—until the Vintage 2022 estimate was released *in May 2023* to file an administrative challenge.

41.     Thus, the Census Bureau was able to delay providing any response to Detroit's challenges to population estimates for 2021 and 2022 until February 26, 2024, forcing the City to live with a radical underestimate of its population—along with the attendant loss of revenue and the false message of population decline—for years.

42.     It is now nearly midway through the decade, and the Census Bureau still refuses to act to produce the "current, comprehensive, and reliable" estimate of Detroit's population that it is required by law to provide.

43.     The Census Bureau's February 26, 2024 response was a final agency determination; Federal Regulations afford Detroit no right of administrative appeal.

44.     Absent judicial intervention, Detroit is without recourse to correct the Bureau's arbitrary and capricious undercounts of the City's population in 2021 and 2022.

## PARTIES

45.     The City of Detroit is a municipal subdivision of the State of Michigan. Detroit is the largest city in Michigan, with a population of over 639,111. More than 77% of Detroit's residents identify as Black or African American, giving the City the highest percentage of Black residents among the 50 largest cities in the United States.

46.     Defendant United States Department of Commerce is an executive department of the federal government with jurisdiction over the Census Bureau. 13 U.S.C. § 2.

47.     Defendant Gina M. Raimondo is the Secretary of Commerce and is sued in her official capacity.

48.     Defendant United States Census Bureau (the "Census Bureau" or the "Bureau") is an agency within, and under the jurisdiction of, the Department of Commerce. 13 U.S.C. § 2.

49.     Defendant Robert L. Santos is the Director of the Census Bureau and is sued in his official capacity.

## JURISDICTION AND VENUE

50.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346(a)(2).

51. The declaratory and injunctive relief sought is authorized under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*.

52. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1). A substantial part of the events giving rise to the claims in this matter occurred in this judicial district. Defendants are United States agencies and employees of United States agencies who are being sued solely in their official capacities.

## GENERAL ALLEGATIONS

### Detroit's Challenge to the 2021 and 2022 Population Estimates

53. In addition to Congress' delegation of authority for conducting the decennial census to the Secretary of Commerce, the Secretary is required to produce "current, comprehensive, and reliable" population estimates for each local unit of government with a population of fifty thousand or more for every year between each decennial census. 13 U.S.C. §§ 141(a), 181(a).

54. The Census Bureau produces annual estimates of state, county, and municipal populations as of July 1 of each year. So the Bureau's Vintage 2021 population estimate for Detroit is its estimate of the City's population as of July 1, 2021.

55. Annual population estimates for cities are typically released in the calendar year following the year for which the population is estimated. Detroit's Vintage 2021 population estimate (estimating the City's population as of July 1,

2021) was published by the Bureau in May 2022. The Vintage 2022 population estimate (estimating the City's population as of July 1, 2022) was published in May 2023.[3]

56.    When the Bureau released its population estimates for Detroit in May 2023, its Vintage 2022 estimate for the City's population was 620,376; its 2021 population estimate was 628,167.[4]

57.    In accordance with promulgated rules, the Census Bureau is required to provide an opportunity for cities to challenge their official estimates through the Population Estimates Challenge Program. Under this program, a city may challenge its population estimate by submitting additional data to the Census Bureau for evaluation.[5]

---

[3] The decennial census counts the population as of April 1 for each year ending in zero. So, Detroit's 2020 Census count—639,111—is the Bureau's count of the population of the City as of April 1, 2020.

[4] The Bureau "revises" its prior population estimates when it releases estimates for a "new" vintage in May. So, for example, when Detroit's 2021 population estimate was first released in May 2022, the Bureau estimated that the City's population was 632,464. When the Vintage 2022 estimate was released in May 2023, the 2021 estimate was "revised" down to 628,167.

[5] The Commerce Department's and Census Bureau's "Procedure for Challenging Population Estimates" is codified at 15 CFR part 90. A complete copy of those regulations is attached as Exhibit A.

58.     The Census Bureau delayed that appeal process. After suspending the

Population Estimates Challenge Program for the 2021 estimate year, the Bureau did

not restart that program in 2022, as guaranteed by the January 9, 2020 Federal

Register Notice temporarily suspending the program during the decennial census.

Instead, on November 22, 2022, the Commerce Department and Census Bureau

promulgated a rule titled "Resumption of the Population Estimates Challenge

Program." In relevant part, the rule stated:

> The Census Bureau will resume accepting challenges to the population
> estimates as of November 22, 2022. At that time, states, counties, and other
> units of general-purpose government may initiate challenges to population
> estimates under the procedures set forth in 15 CFR part 90. The Census
> Bureau will accept challenges to the estimates for 2021 and subsequent years
> in forthcoming estimates series, beginning with the Vintage 2022 series that
> is scheduled to be published in March and May of 2023.[6]

Thus, challenges to 2021 population estimates would not be accepted by the Census

Bureau until May 2023, forcing cities like Detroit to accept faulty estimates with no

recourse.

59.     Concerned about the accuracy of annual population estimates,

Congress issued Report language in the House Commerce, Justice, Science and

Related Agencies Appropriations Bill (H. Rept. 117-395, at 19), adopted in the fiscal

---

[6] While the Rule states that the Census Bureau would resume accepting
challenges as of November 22, 2022, the Rule has been interpreted to delay all
challenges until May 2023.

16

year 2023 omnibus spending bill (H.R. 2617) signed into law by President Biden on

December 29, 2022, instructing the Census Bureau to improve the estimates:

> The Committee notes that decennial census counts are the basis for annual population estimates that are used to distribute Federal resources, and therefore, those estimates should be as accurate as possible. *As the Census Bureau reinstates the Population Estimates Challenge Program this decade, the Census Bureau should consider more flexible methodologies and broader use of administrative data to ensure meaningful opportunities to improve the accuracy of the estimates, including appropriate improvements to the estimates base.* (Emphasis added.)

60.    With this Congressional direction in force, the City submitted an

administrative challenge to the 2021 and 2022 population estimates on August 16,

2023 (the "Challenge"). A copy of the letter from Detroit Mayor Michael E. Duggan

accompanying the City's Challenge is attached as Exhibit B.[7]

---

[7]   Following receipt of Detroit's Challenge, Census Bureau staff communicated with the City regarding certain data submitted in the Challenge, including the time periods for which certain data were reported. In response to this communication, the City submitted revised data on September 15, 2023. Challenge data cited in this Complaint are the revised September figures.

61.     The City's Challenge demonstrated that the Census Bureau's estimate of Detroit's population was clearly wrong when compared to estimates derived from other data sources, as reflected in the table below:

*Comparison of Detroit Housing Unit Change 4/1/20-7/1/22 by data source*

| Source | Change in Housing Units |
| --- | --- |
| Census Bureau | (- 2,126) |
| U.S. Postal Service | + 6,771 |
| DTE Residential Utility Customers | + 10,890 |
| City of Detroit Challenge | + 8,916 |

62.     In support of its Challenge, the City submitted housing unit data in seven categories, addressing both housing unit gains and housing unit losses. Those categories were:

63.     **New Construction Permits.** The City's data showed that the Bureau undercounted the number of permits issued for new construction by the City's Buildings, Safety Engineering, and Environmental Department ("BSEED") for construction in 2022. For 2022, 1,172 new construction permits were issued for new housing units, 158 more than the Bureau's original estimate.[8]

64.     **Detroit Land Bank Authority ("DLBA") Compliance.** DLBA uses a variety of sales programs to support homeownership and land purchases in Detroit.

---

[8] Because the Census Bureau assumes a six month delay between issuance of a construction permit and actual construction, and because the Vintage 2022 population estimate is based upon the estimated population as of July 1, 2022, the 1,172 construction permits relevant to the population estimate for 2022 were issued between January 1, 2021 and December 31, 2021.

Each month, the land bank sells hundreds of structures to purchasers charged with rehabilitating the structure to inhabitable condition. The Land Bank sells these homes pursuant to purchase agreements that mandate the rehabilitation and re-occupancy of each structure sold. Land Bank staff monitor the rehabilitation process, preserving the right to reconvey a home to the Land Bank if the purchaser does not fulfill the obligation to rehabilitate it. To release this reconveyance right, the Land Bank requires an inspection of the home to certify all compliance requirements have been met. "Compliance" is achieved by a homeowner's rehabilitating a property and inhabiting the home. In its Challenge, the City argued that properties achieving DLBA "Compliance" should be counted in the category of permitted residential construction. For 2021, 889 properties achieved DLBA Compliance. For 2022, 1,481 achieved Compliance.

65. **Renovation and Rehabilitation Permits.** In its Challenge, the City noted that not all permits resulting in newly-inhabitable housing are specifically categorized as "new construction" permits. Rather, many permits issued by BSEED for rehabilitation or renovation resulted in newly-inhabitable housing. Reviewing such permits, the Challenge showed that an additional 466 housing units should be added to the count of permitted residential construction for 2021. For 2022, 531 additional housing units should be added based on rehabilitation and renovation permits.

66.    **Pre-2020 Multi-Family Building Permits.** The City's Challenge identified seven large-scale residential housing projects for which new construction permits were issued prior to 2020, but the housing units in those projects would not have been counted in the 2020 Census because the projects were not complete and the housing units in those projects would not have been inhabitable in 2020 per Bureau guidelines. 274 housing units from those seven projects, which are now complete, should have been included in the count of permitted residential construction for 2021.

67.    **Non-Residential to Residential Housing Conversions.** The City's Challenge showed a net gain of 248 non-residential to residential housing conversions for 2021, which were not reflected in the Bureau's original estimates.

68.    **Non-Permitted Residential Construction.**  As noted above, because Detroit is an older city, most construction leading to new inhabitable housing units is not preceded by a traditional permit. Any realistic estimate of housing units in Detroit must factor in non-permitted residential construction. The City's Challenge proved that many new housing units became inhabitable without issuance by the City of any type of permit. The City proved this by analyzing U.S. Postal Service, DTE Energy, and Detroit Water and Sewerage Department ("DWSD") data. Those records showed significant year-over-year increases in inhabited (and inhabitable) housing units in the City, far exceeding the number of permits issued. For 2021, the

20

City showed in its Challenge that 711 housing units should be added to the Bureau's count of "Non-Permitted Residential Construction." For 2022, 1,341 housing units should be added.

69. **Housing Unit Loss.** The Bureau's original 2022 population estimate reflected a loss of 2,280 housing units in Detroit based on a count of demolished structures. The 2021 estimate reflected a loss of 1,745 housing units on the same basis. The City's Challenge explained that the Bureau's "Housing Unit Loss" factor incorrectly assumes that demolitions in Detroit result in a loss of population. That assumption is inconsistent with reality: the "loss" of one of these structures does not mean any population has been lost; it simply means a neighborhood is being improved. Therefore, the Bureau's estimate for housing unit loss for both 2021 and 2022 should be corrected.

70. Taken together, the housing unit data submitted by the City in its Challenge showed a net increase in Detroit's housing stock of 3,144 units in 2021 (compared to 2020) and a net increase of 4,525 housing units in 2022 (compared to 2021).

71. By comparison, the Census Bureau's original estimate reflected a loss of 887 housing units in 2021 (compared to 2020) and a loss of 1,239 units in 2022 (compared to 2021).

**The Census Bureau's Response**

72.     The Bureau's February 26, 2024 response to Detroit's administrative challenge (the "Response") did not analyze the Challenge according to the categories of housing unit data the City submitted.[9] Nor did the Response explicitly state the revised housing unit count for each year. Rather, the Response concluded that, based on the Challenge, Detroit's population estimate for 2021 would be revised from 628,167 to 630,637, and the estimate for 2022 would be revised from 620,376 to 625,561.

73.     From these revised population estimates, and assuming an average population per housing unit figure of 2.0249 (from Census Bureau data), the City has inferred the change in housing units in the revised estimate compared to the original. For 2021, the Bureau's upward adjustment of 2,470 people reflects an upward adjustment of approximately 1,220 housing units. For 2022, the Bureau's upward adjustment of 5,185 people reflects an upward adjustment of approximately 2,560 housing units.

74.     Regarding the Challenge data concerning building permits and non-residential to residential housing conversions, the Bureau's Response states that "[t]he additional building permits and conversions data you provided were

---

[9] A copy of the Census Bureau's Response is attached as Exhibit C.

determined to satisfy these [data quality] requirements and have been accepted." By the plain language of the Response, then, it appears that the data submitted by the City in its Challenge regarding permitted construction, as well as conversions, were accepted and have been incorporated into the revised estimates.[10]

75.    However, regarding the Challenge data on non-permitted residential construction, the Bureau's Response states:

> [P]er our Vintage 2022 HU estimates methodology, we only distribute non-permitted builds (also known as non-permitted residential construction) to places that would not otherwise receive building permits, because mixing these types of data could lead to overestimation and coverage issues. Consequently, we were unable to accept your additional data on either permitted builds or non-permitted residential construction for the same primitive geography. (Emphasis in original.)

76.    Thus, the Bureau rejected the City's Challenge data on non-permitted construction because the Bureau's policy is to use only one type of data (*i.e.* permitted, or non-permitted, but not both) for any given geographical area ("primitive geography").

77.    The policy of restricting cities to one type of data to show housing unit increases—permitted    construction    or    non-permitted    construction—clearly

---

[10] Because the Bureau only provided revised population estimates in its Response—without any underlying data—it is impossible to conclude exactly what housing unit data (including, for example, data on DLBA Compliance properties and properties with BSEED renovation permits) the Bureau incorporated into its revised estimates.

discriminates against older cities in which some construction is permitted and some construction is not.

78.    This policy directly contravenes the direction of Congress that "the Census Bureau should consider more flexible methodologies and broader use of administrative data to ensure meaningful opportunities to improve the accuracy of the estimates, including appropriate improvements to the estimates base."

79.    Regarding housing unit loss, *i.e.* demolitions, the Response states:

As for the additional HU [housing unit] loss input data you provided, including permitted residential demolitions (e.g., demolition permits) and non-permitted residential HU loss (e.g., a unit for which there was not a demolition permit issued), these data do not adhere to the same definition of HU loss used by the Census Bureau to produce the HU loss estimates . . . . The Vintage 2022 HU estimates methodology statement, in conjunction with the definition employed by the American Housing Survey (AHS), provides that **"both occupied and vacant units are counted"** (housing loss rates from the AHS are used as an input to produce our estimates of HU loss). Thus, without a value for loss representing both occupied and unoccupied units, we were also unable to accept your data on HU loss. (Emphasis added.)

80.    Accordingly, the Bureau rejected the City's evidence that demolition of uninhabitable, long-vacant housing units should not be counted for the purpose of estimating Detroit's population.

81.    This policy prevents the Bureau from meeting its statutory obligation to deliver a "current, comprehensive, and reliable" estimate of the population of every state, county and city in the United States with a population of fifty thousand or more.

**Housing Unit Loss**

82.    The Bureau's "Housing Unit Loss" factor assumes that demolition activities undertaken to enhance the quality of life in the City result in a *loss* of population.[11] That assumption is inconsistent with reality and disproportionately affects older cities with larger minority populations.

83.    Over the past decade, Detroit has undertaken an extensive program of demolishing and clearing blighted structures to improve the safety and vitality of the City's neighborhoods. Detroit's demolition program is unique among major cities in its magnitude and scope; it has contributed to safer neighborhoods, increased property values, and the removal of blight, paving the way for new development and population *growth*.

84.    In evaluating the population of the city which has undertaken the nation's largest and most successful demolition program, the Bureau's unyielding formula concludes that each time a vacant, uninhabitable building is demolished 2.0249 people leave the City of Detroit.

85.    This formula was clearly designed for newer and more affluent communities, where there are virtually no abandoned houses. In more affluent communities, when a housing unit is lost, that loss is typically caused by a tragedy

---

[11] A copy of the Census Bureau's "Methodology for State and County Total Housing Unit Estimates (Vintage 2022)" is attached as Exhibit D.

or natural disaster, such as a fire, hurricane, or flood, and it is likely that the home was both inhabitable and occupied at the time of destruction. In such circumstances, there is a rational basis to assume that the loss of a housing unit corresponds to a contemporaneous loss of population, because a family had been living there. This assumption makes sense in wealthy communities, but not in Detroit and other older cities.

86.    When that formula is applied to older and blighted communities, it leads to a completely irrational outcome.

87.    Detroit's widespread blight left the City an inventory of more than 40,000 abandoned houses when the City undertook its massive and extraordinarily successful demolition program ten years ago. In 2021 and 2022, the two years at issue here, the City successfully demolished more than 4,000 uninhabitable, abandoned houses.

88.    But the Census Bureau—rather than honoring the instructions of Congress to produce "current, comprehensive, and reliable data"—applied to Detroit (and other older cities) the same population estimate formula it applies to newer and more affluent communities: the Bureau treated those 4,000 demolished buildings as if they were fully occupied homes and absurdly concluded that Detroit lost more than 8,000 residents as a result of the demolition of these vacant, uninhabitable buildings.

89.     This formula creates a phantom population loss every time Detroit demolishes an abandoned house.

90.     The Bureau's Vintage 2022 population estimate reflects a loss of 2,280 inhabitable housing units in Detroit based on a count of demolished structures. The 2021 estimate reflects a loss of 1,745 inhabitable housing units on the same basis. Both of these figures are wrong.

91.     The structures that were demolished had been vacant and uninhabitable for years and presented a risk to the safety and well-being of the surrounding neighborhood. The "loss" of one of these structures does not equate to any lost population.

92.     Accordingly, to properly estimate Detroit's population and produce "current, comprehensive, and reliable data," the demolition of vacant, uninhabitable houses should not be a factor.

93.     No data could possibly support the discriminatory, arbitrary and capricious conclusion that demolition of abandoned, uninhabitable houses is evidence of population decline. Therefore, the Bureau should accept evidence from the City correcting this inaccurate input to Detroit's population estimates and should revise its estimates accordingly.

### Non-Permitted Residential Construction

94.     In Detroit and other older cities, most newly-inhabitable housing is not captured in permits for new construction, but the Census Bureau's inflexible formula assumes that—as in newer, wealthier communities—a construction permit is issued for every newly-inhabitable house.

95.     The Census Bureau's Population Estimates Challenge Review Guide states that "the Census Bureau will consider a challenge based on data related to changes in an area's housing stock, such as building permits, **non-permitted construction**, certificates of occupancy, housing conversions, demolition and housing loss, mobile home placements, occupancy rates, [persons-per-household], and the group quarters population." (Emphasis added.)

96.     Notwithstanding this explicit guidance that the Bureau will consider evidence of non-permitted construction, and notwithstanding its statutory duty to produce "current, comprehensive, and reliable data," in its Response, the Census Bureau rejected all of the data submitted by Detroit concerning non-permitted residential building.

97.     Thousands of formerly abandoned homes are now being renovated and newly occupied in Detroit each year. Far fewer permitted homes are built from scratch. The Census Bureau formula does not recognize families that renovate and move into previously abandoned homes if no construction permit is issued.

98. For Detroit, the category of non-permitted construction is especially important, since not all newly-inhabitable housing in the City is captured in BSEED building permits or in other types of formal municipal approval.

99. In Detroit and other older, less affluent, cities, a new housing unit is more likely to be "constructed" by the non-permitted renovation or rehabilitation of an abandoned house than by the construction of a new house on a vacant lot. The Census Bureau's inflexible policies, requiring proof of permit issuance to establish "construction," guarantee that the Bureau will underestimate the number of newly-inhabitable structures in Detroit.

100. As the City established in its Challenge, a variety of local administrative data—other than construction permit data—shows an increase in housing units in the City.

101. Specifically, to identify housing units that became inhabitable during the relevant time periods for the 2021 and 2022 population estimates (and thus should have been counted in the housing unit estimates), the City analyzed U.S. Postal Service data (to identify housing units that are now receiving—but for many years prior had not been receiving—mail), as well as DTE Energy data (identifying "new active residential service households") and DWSD accounts showing a change from "no water usage" to "water usage" after the 2020 Census.

102. The City also reviewed imagery of housing units to identify properties that were open to the elements as of April 2020 (and thus would not have been in the Census Bureau's housing unit count as of the decennial census) but were subsequently renovated and are now inhabitable.[12]

103. Any properties that were verified by these data sources should be added to the City's housing unit count even though no construction permit was issued.

104. The Bureau's decision to reject all of the newly-inhabitable housing units identified through this review is discriminatory, arbitrary and irrational, and contravenes the Bureau's mandate to provide an accurate population estimate, as well as the Bureau's own guidance stating that such evidence "will [be] consider[ed]."

105. Even when the records of the U.S. Postal Service, DTE Energy, and DWSD show conclusively that new families have moved into previously abandoned houses, the U.S. Census Bureau refuses to recognize the existence of these new residents.

---

[12] In its analysis of the 2021 population estimate, the City reviewed property imagery, comparing current parcel imagery to parcel imagery as of April 1, 2020. A team of reviewers examined publicly available images for parcels using Google Maps Street View and/or Detroit Street View, as well as aerial imagery available through the Detroit Assessor's Office, which provides oblique georeferenced imagery showing the fronts and sides of buildings. In its analysis of the 2022 population estimate, the City reviewed property imagery as of July 1, 2022.

106.   The Bureau's failure to accept the City's Challenge regarding non-permitted construction directly contravenes the Congressional instruction to "consider more flexible methodologies and broader use of administrative data to ensure meaningful opportunities to improve the accuracy of the estimates."

107.   There can be no greater example of discrimination in the Census Bureau's population estimate formula than the deliberate policy of adding families who build new houses from scratch in affluent communities, while refusing to count families who renovate and move into houses in poorer and minority communities. This policy is in direct conflict with the Bureau's statutory mandate to produce "current, comprehensive, and reliable data" and the Congressional directive to improve the accuracy of its estimates with available administrative data.

### The County Cap

108.   As outlined above, the Bureau's initial estimate of the City's population is calculated by multiplying the number of housing units in the City by an average "household population per housing unit" figure, which for Detroit is 2.0249. This results in what the Bureau calls the "uncontrolled household population estimate" for the City.[13]

---

[13] The Bureau refers to "household population" here to distinguish from "group quarters" population. Group quarters are facilities such as nursing homes or college dormitories, in which a large number of people live at one address. The Census Bureau adds the group quarters population to the household population at the end of its process to arrive at a final estimate.

109.   The Bureau doesn't stop here, though. It takes another step to produce what it calls a "controlled" household population estimate. The word "controlled" signals that the Census Bureau employs a method that constrains the household population estimates of cities and towns, so that the sum of the estimated populations of all municipalities within a county must match the estimated population for the county as a whole.

110.   County-level population estimates are derived using an entirely different methodology. Rather than taking housing units as the fundamental unit of measure (as is done for cities), for counties, the Census Bureau looks at births, deaths, and domestic and international migration into and out of each county.[14]

111.   The process for controlling the household population estimates of cities and towns is commonly referred to as a "County Cap" because it constrains the growth of municipal populations to fit within the estimated change in the county's population.

112.   The County Cap works by application of a "rake factor" to a city's population estimate. In Detroit's case, that rake factor was .9885 for 2021 and .9785 for 2022. That is, having arrived at an initial estimate of Detroit's population for each of those years, the Census Bureau's final, published estimate was only 98.85%

---

[14] Attached as Exhibit E is the Census Bureau's "Methodology for the Subcounty Total Resident Population Estimates (Vintage 2022)," which describes the County Cap methodology.

(for 2021) and 97.85% (for 2022) of the initial estimate, due to application of this arbitrary and capricious rule.

113.   Application of the County Cap reduced Detroit's population estimate by 7,192 people for 2021 and by 13,407 people for 2022.

114.   The County Cap punishes the City of Detroit by reducing the City's population estimate, not because of an actual decrease in Detroit's population, but because of population lost in other Wayne County cities or because of the Census Bureau's failure to properly estimate Wayne County's population.

115.   The Bureau's use of the artificial County Cap rule to further reduce Detroit's population is arbitrary and capricious and violates the Bureau's statutory mandate to produce current, comprehensive and reliable data: having estimated the City's population based on methodological guidelines starting with the number of housing units, only to effectively disregard that estimate and reduce it by an additional two or three percent—based on a county-level estimate using a completely different methodology—defies rational explanation.

## The City Has Been Significantly Harmed

116.   The impact of the 2021 and 2022 population estimates' undercount of Detroit is severe. Since 2010, the City of Detroit and its residents have received more than $3.5 billion annually in federal funding tied directly to the most recent census figures.

33

117. Because annual population estimates are used as statistical inputs for census programs such as the American Community Survey ("ACS") and other federal surveys that are directly tied to allocation formulas or eligibility criteria for programs that provide funding to the City and its residents, the City of Detroit can lose tremendous amounts of federal funding when its population is incorrectly estimated.

118. According to the Commerce Department and the Census Bureau, every year *trillions* of dollars are allocated based in whole or in part on Census Bureau data. The Census Bureau's website reports that in fiscal year 2021 "more than $2.8 trillion in federal funds were distributed in whole or in part to states, communities, tribal governments and other recipients using Census Bureau data. At least 353 federal assistance programs used Census Bureau data to distribute federal funds in [that year]. Some of the top programs funded healthcare, nutrition, highways, housing, school lunches, childcare, and COVID assistance."[15]

119. As Thomas Mesenbourg, then-Acting Director of the Census Bureau explained in testimony before the House Committee on Oversight and Government Reform:

---

[15] See "The Currency of Our Data: A Critical Input Into Federal Funding," U.S. Census Bureau, June 14, 2023. Available at https://www.census.gov/library/fact-sheets/2023/adcom/federal-funding-distribution.html?utm_medium=email&utm_source=govdelivery

The population estimates are used in many formulas to allocate funding. They are also used in the production of the final American Community Survey estimates released to the public. Thus the quality of the official population estimates and the American Community Survey are inextricably linked to the accuracy of the decennial census. Federal agencies that administer grants and other Federal funds allocation programs typically use a mix of the decennial census, population estimates, and information from the American Community Survey.[16]

120.    The City receives and is directly impacted by federal funding tied to the annual estimates of population and housing units through many different programs:

- The City benefits from millions of dollars allocated annually through the Supplemental Nutrition Program for Women, Infants, and Children based on annual population estimates and ACS data.

- The City receives millions of dollars annually through HUD's HOME Investment Partnerships Program based on ACS data.

- Funding directed to the City through the federal government's Emergency Solutions Grants program is negatively affected by the reported population loss in the Bureau's annual population estimates.

- Community Development Block Grant funding is negatively affected by the erroneous and racially-biased undercount of Detroit's residential housing units in the 2021 and 2022 annual estimates.

- Detroiters benefit from Medicaid, Head Start, transit programs, Title 1 grants to local education agencies, and myriad other programs, funding for which is allocated, in whole or in part, on the basis of annual population estimates.

---

[16] Hearing before the Subcommittee on Information Policy, Census, and National Archives, One Hundred Eleventh Congress, July 9, 2009, No. 111-23, available at https://www.govinfo.gov/content/pkg/CHRG-111hhrg53869/html/CHRG-111hhrg53869.htm

121.   The City and its residents are harmed by the loss of federal funding caused by the 2021 and 2022 population estimates' undercount of Detroit's population and housing units.

122.   Based on the 2021 and 2022 population estimates' racially-biased undercount of Detroit, resulting from the Census Bureau's failure to follow its statutory obligations, the City and its residents will be short-changed hundreds of millions of federal and state dollars, while the false story that Detroit is losing population threatens to slow the momentum of the City's growth.

**FIRST CAUSE OF ACTION**
**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT**
**5 U.S.C. § 706(2)(A)—HOUSING UNIT LOSS**

123.   The preceding paragraphs are repeated and realleged as if fully set forth herein.

124.   Pursuant to 5 U.S.C. § 706(2)(A), this Court shall hold unlawful and set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

125.   Pursuant to 13 U.S.C. § 181(a), the Bureau is required, to the extent feasible, to produce reliable population estimates for each local unit of government with a population of fifty thousand or more for every year between each decennial census.

126. Under 15 CFR § 90.9:

> The Chief, Population Division, Census Bureau, or the Chief's designee shall review the evidence provided with the request for the population estimate challenge, shall work with the governmental unit to verify the data provided by the governmental unit, and evaluate the data to resolve the issues raised by the governmental unit.

127. Defendants' decision to treat the demolition of vacant, uninhabitable structures in Detroit as evidence of population loss is arbitrary, capricious, and an abuse of discretion.

128. The policies challenged by this cause of action are subject to judicial review under the Administrative Procedure Act because no statute precludes judicial review and the agency actions at issue are not committed to agency discretion by law.

129. Reducing the estimate of Detroit's population because of the demolition of vacant, uninhabitable structures violates Defendants' statutory and regulatory mandates to produce "current, comprehensive, and reliable data" and to provide a reliable estimate of the City's population.

## SECOND CAUSE OF ACTION
## VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
## 5 U.S.C. § 706(2)(A)—NON-PERMITTED CONSTRUCTION

130.    The preceding paragraphs are repeated and realleged as if fully set forth herein.

131.    Pursuant to 5 U.S.C. § 706(2)(A), this Court shall hold unlawful and set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

132.    Pursuant to 13 U.S.C. § 181(a), the Bureau is required, to the extent feasible, to produce reliable population estimates for each local unit of government with a population of fifty thousand or more for every year between each decennial census.

133.    Under 15 CFR § 90.9:

> The Chief, Population Division, Census Bureau, or the Chief's designee shall review the evidence provided with the request for the population estimate challenge, shall work with the governmental unit to verify the data provided by the governmental unit, and evaluate the data to resolve the issues raised by the governmental unit.

134.    Defendants' refusal to accept evidence of both permitted and non-permitted construction of new inhabitable housing units in Detroit as part of the City's administrative challenge to the population estimates is arbitrary, capricious, and an abuse of discretion.

135. The policies challenged by this cause of action are subject to judicial review under the Administrative Procedure Act because no statute precludes judicial review and the agency actions at issue are not committed to agency discretion by law.

136. There is no rational basis for Defendants' decision to reject reliable administrative data showing an increase in the number of housing units in Detroit. As such, Defendants' refusal to accept data concerning both permitted and non-permitted residential construction is not in accordance with Defendants' statutory and regulatory mandates to produce a current, comprehensive, and reliable estimate of the City's population.

### THIRD CAUSE OF ACTION
### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
### 5 U.S.C. § 706(2)(A)—COUNTY CAP

137. The preceding paragraphs are repeated and realleged as if fully set forth herein.

138. Pursuant to 5 U.S.C. § 706(2)(A), this Court shall hold unlawful and set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

139. Pursuant to 13 U.S.C. § 181(a), the Bureau is required, to the extent feasible, to produce reliable population estimates for each local unit of government

with a population of fifty thousand or more for every year between each decennial census.

140. Under 15 CFR § 90.9:

> The Chief, Population Division, Census Bureau, or the Chief's designee shall review the evidence provided with the request for the population estimate challenge, shall work with the governmental unit to verify the data provided by the governmental unit, and evaluate the data to resolve the issues raised by the governmental unit.

141. The Bureau's County Cap rule irrationally restricts adjustments to Detroit's population estimates that are otherwise supported by evidence submitted through an administrative challenge and thus precludes meaningful relief.

142. The Bureau's adoption of the unpromulgated County Cap rule is contrary to its statutory mandate to produce reliable population estimates "to the extent feasible."

143. The policies challenged by this cause of action are subject to judicial review under the Administrative Procedure Act because no statute precludes judicial review and the agency actions at issue are not committed to agency discretion by law.

144. When, as here, Detroit has presented evidence that its population is miscounted in the Census Bureau's annual population estimates, the Bureau's refusal to fully account for that evidence because of an artificial County Cap makes

the right to challenge illusory and constitutes an arbitrary and capricious act and an abuse of discretion.

## FOURTH CAUSE OF ACTION
## VIOLATION OF THE FIFTH AMENDMENT'S GUARANTEE OF EQUAL PROTECTION

145. The preceding paragraphs are repeated and realleged as if fully set forth herein.

146. The Fifth Amendment to the United States Constitution requires that the federal government not deny people the equal protection of its laws and prohibits the federal government from discriminating against persons living in the United States on the basis of race or ethnicity.

147. Methodologies employed by the Bureau in calculating its annual estimate of the City's population—including, without limitation, the "housing unit loss" factor, which disproportionately discriminates against predominantly minority communities with older housing; the refusal to acknowledge non-permitted construction and the renovation of existing but previously blighted and vacant homes as evidence of population increase; and the County Cap rule, under which evidence establishing an increase in Detroit's majority-minority population is necessarily offset by county-level figures related to communities outside of Detroit or to the Bureau's undercount of Wayne County—have a disparate impact on the City and its Black and Hispanic residents.

148.   Defendants' actions, as detailed herein, bear no rational relationship to achieving an accurate estimate of Detroit's population and are in direct contravention of the Census Bureau's statutory mandate and of a Congressional directive.

149.   Defendants' actions have resulted in actual discrimination against Detroit's Black and Hispanic residents by excluding many of them from the 2021 and 2022 population estimates, by delaying the City's right to appeal those inaccurate estimates, and by failing to afford the City any remedy to correct that undercount.

150.   The Census Bureau's adoption of policies that benefit newer, wealthier areas to the detriment of older, less affluent cities has caused a reduction in the levels of federal funding, benefits, and other resources to which the City of Detroit and its Black and Hispanic residents are entitled.

151.   Black and Hispanic Detroiters have suffered, and will continue to suffer, discriminatory effects due to the racially-biased undercount reflected in, and reinforced by, the 2021 and 2022 population estimates.

152.   Those discriminatory effects include a reduction in the amount of federal funds available to Detroiters, a city where Black and Hispanic residents collectively comprise over 85% of the population.

153. Defendants' intentional actions, reflected in, and reinforced by, the 2021 and 2022 population estimates for the City of Detroit, are discriminatory and without rational basis, let alone any important or compelling governmental interest.

### **PRAYER FOR RELIEF**

WHEREFORE, the City of Detroit respectfully requests that this Court:

1.    Hold unlawful and set aside the Bureau's policy of treating the demolition of vacant, uninhabitable structures in Detroit as evidence of population loss;

2.    Hold unlawful and set aside the Bureau's refusal to accept evidence of both permitted and non-permitted construction of new inhabitable housing units in Detroit as part of the City's administrative challenge to the population estimates;

3.    Hold unlawful and set aside the Bureau's application of the County Cap rule;

4.    Issue an Order compelling the Census Bureau to accept the verifiable and reliable data submitted by the City as part of its administrative challenge to the population estimates;

5.    Declare that Defendants' intentional refusal to correct the racially-biased undercount of Detroit's population in the annual population estimates negatively and disproportionately affects the count of the City and results in actual discrimination against Detroit's Black and Hispanic residents;

6.     Award Plaintiff its reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

7.     Award such additional relief as the Court deems proper.

Respectfully submitted,

Dated: March 26, 2024               FINK BRESSACK

By: */s/ David H. Fink*
David H. Fink (P28235)
Philip D.W. Miller (P85277)
Nathan J. Fink (P75185)
645 Griswold Street, Suite 1717
Detroit, Michigan 48226
(313) 387-3300

CITY OF DETROIT
LAW DEPARTMENT
Conrad L. Mallett, Jr. (P30806)
Coleman A. Young Municipal Center
2 Woodward Avenue, Suite 500
Detroit, Michigan 48226
(313) 224-4550

*Attorneys for Plaintiff City of Detroit*