# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

THE CITY OF DETROIT,

          Plaintiff,

    v.

UNITED STATES DEPARTMENT
OF COMMERCE, *et al.*,

          Defendants.

Case No. 2:24-cv-10775-MFL-APP
Hon. Matthew F. Leitman
Hon. Anthony P. Patti

## DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

STEPHEN M. ELLIOTT
Assistant Branch Director
Federal Programs Branch

STEPHEN M. PEZZI
 Senior Trial Counsel
TAYLOR PITZ
 Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
Tel: (202) 305-8576
Email: stephen.pezzi@usdoj.gov

*Counsel for Defendants*

For the reasons stated in the accompanying brief and in Defendants' prior summary-judgment briefs (ECF Nos. 32, 34, 36), all of which are incorporated here by reference with the Court's permission, the Court should dismiss this suit for lack of subject-matter jurisdiction or, in the alternative, enter summary judgment for Defendants on Counts III and IV.

Undersigned counsel certifies that, in accordance with Local Rule 7.1(a)(2)(A), "there was a conference between attorneys . . . in which the movant explained the nature of the motion . . . and its legal basis and requested but did not obtain concurrence in the relief sought." *See* ECF No. 50, page ii.

Date: November 26, 2025          Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

STEPHEN M. ELLIOTT
Assistant Branch Director
Federal Programs Branch

/s/ Stephen M. Pezzi
STEPHEN M. PEZZI
 Senior Trial Counsel
TAYLOR PITZ
 Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Tel: (202) 305-8576
Email: stephen.pezzi@usdoj.gov

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

THE CITY OF DETROIT,

               Plaintiff,

     v.

UNITED STATES DEPARTMENT
OF COMMERCE, *et al.*,

               Defendants.

Case No. 2:24-cv-10775-MFL-APP
Hon. Matthew F. Leitman
Hon. Anthony P. Patti

## SUPPLEMENTAL BRIEF IN SUPPORT OF DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S RENEWED MOTION FOR SUMMARY JUDGMENT

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

STEPHEN M. ELLIOTT
Assistant Branch Director
Federal Programs Branch

STEPHEN M. PEZZI
Senior Trial Counsel
TAYLOR PITZ
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
Tel: (202) 305-8576
Email: stephen.pezzi@usdoj.gov

*Counsel for Defendants*

# <u>TABLE OF CONTENTS</u>

INTRODUCTION.........................................................................................................1

BACKGROUND...........................................................................................................3

ARGUMENT................................................................................................................5

I.     Detroit has still not carried its burden to demonstrate Article III
standing..............................................................................................................6

     a.     Detroit continues to ignore effects on other jurisdictions.........................6

     b.     Detroit has only offered evidence about a single year—a year that
is not even at issue in this litigation. .......................................................15

     c.     Dr. Morenoff did not properly account for margins of error. ................19

II.     The appropriate remedy is dismissal.................................................................22

CONCLUSION...........................................................................................................23

# TABLE OF AUTHORITIES

## CASES

*City of Columbus v. Kennedy*,
  ---F. Supp. 3d---, 2025 WL 2426382 (D. Md. Aug. 22, 2025),
  *appeal filed*, No. 25-2012 (4th Cir. Aug. 29, 2025) ........................................................ 13

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ................................................................................................ 22

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ..............................................................................................3, 12, 22

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ................................................................................................ 12

*Trump v. CASA, Inc.*,
  606 U.S. 831 (2025) ..............................................................................................11, 13

## STATUTES

5 U.S.C. § 706 ........................................................................................................ 13

13 U.S.C. § 181 ...................................................................................................... 14

42 U.S.C. § 5306 ...................................................................................................... 6

## UNITED STATES CONSTITUTION

U.S. Const. art. 1, § 2 ............................................................................................ 20

## RULES

Fed. R. Civ. P. 12 .................................................................................................. 23

## OTHER AUTHORITIES

City of Detroit, *Detroit grows in population for the first time in decades*, May 16, 2024
  Press Release,
  https://perma.cc/W8E5-XV7Y ............................................................................16, 17

**INTRODUCTION**

When it comes to the extraordinarily complex task of annually estimating the population of every State, county, and city in the United States, Plaintiff the City of Detroit's preference is clear: any methodology that results in higher population numbers for Detroit. But due to its obligation to serve the entire country, and not just one geographic area, the United States Census Bureau uses the most accurate available methodology for the United States as a whole. Defendants thus disagree with Detroit's ever-evolving critiques of the Census Bureau's methods. And of course, even if reasonable minds could differ on the optimal approach, the Administrative Procedure Act (APA) does not contemplate court-ordered micromanagement of granular methodological choices by agency experts—particularly not where, as here, no available method is perfect. And so, for all the reasons in Defendants' prior briefs, if the Court ever reaches the merits, all of Detroit's claims should be rejected.

On the threshold question of Article III standing, however, the disagreement between the parties is far narrower. Defendants have never disputed "that, as a general matter, *some* Census Bureau data products are *sometimes* relevant to *some* amount of funding to *some* local governments." Defs.' Mot. for Summ. J. at 16, ECF No. 32 ("Defs.' MSJ"). And Detroit, for its part, has acknowledged that even if "new population estimates will come from the government or be ordered to be issued by the government," "[t]hose population estimates may or may not affect actual funding, in a short term." Tr. of May 10, 2024 Status Conference at 9:2-5, ECF No. 13. And so, when it comes to Article III standing, the primary dispute is an evidentiary one: whether

1

Plaintiffs have carried their burden to show that winning or losing this lawsuit has actual—not just theoretical—financial stakes for the City of Detroit.

In answering that question, at the prior motions hearing in this case, the Court could hardly have been clearer about what Detroit had failed to show then—and thus, what Detroit needs to show now—for this Court to continue to exercise jurisdiction. And to their credit, Detroit has now—at least in part—put forth at least some evidence that addresses at least some of the issues raised during the previous round of briefing.

But when it comes to Article III subject-matter jurisdiction, partial credit is not good enough. This Court could have dismissed Plaintiff's claims last year, but it instead provided Detroit a second chance to carry its evidentiary burden, authorizing expert discovery. Despite that opportunity, however, it remains entirely unclear whether Detroit has actually been harmed (rather than helped) by Census Bureau methods. Indeed, some of the critical unanswered questions—including those highlighted by the Court at the prior hearing, such as how other jurisdictions' population estimates might be affected by Detroit's preferred methods—went almost entirely unaddressed by Plaintiff's experts. Those experts also failed to properly account for margins of error, and analyzed data from only one year—a year that is not even at issue in this lawsuit.

Two bites at the apple are enough. Detroit has now unquestionably had a full and fair opportunity to develop the record on Article III standing. Having failed to carry that burden twice, this suit should now be dismissed for lack of subject-matter jurisdiction. In the alternative, summary judgment should be entered for Defendants on the merits of all remaining claims, for the reasons stated in Defendants' prior briefs, ECF Nos. 32, 34, 36, all of which are incorporated here by reference.

# BACKGROUND[1]

In August 2024, the parties cross-moved for summary judgment on Plaintiffs' two remaining claims, Counts III and IV. *See* ECF Nos. 32-37. As part of that briefing, Defendants argued that Detroit had not carried its evidentiary burden, as required at the summary-judgment stage, to show Article III standing. *See* Defs.' MSJ at 11-17, (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). The parties also submitted extensive briefing on the merits of Plaintiffs' two remaining claims.

On December 5, 2024, the Court held a hearing, and asked a series of questions about the evidentiary record on standing. For example, the Court explained that it "underst[ood] the plausibility of" Plaintiff's standing theory in the abstract but was "struggling" to square that theory with the record before the Court. Ex. 1, Tr. of Dec. 5, 2024 Hr'g on Mots. For Summ. J. at 8:23-9:2, ECF No. 40 ("MSJ Hearing"). The Court noted that "[t]o say that funding is tied to population estimates is not to say – or doesn't necessarily support the conclusion that if the estimates are wrong, the funding changes." *Id.* at 9:3-6. The Court emphasized that it was "focusing on . . . the bridge that gets you there, more specifically, the evidence that gets you there." *Id.* at 9:20-22. Ultimately, the Court asked: "is there any evidence in this record" that the challenged methodologies "actually impacted funding" to the City of Detroit? *Id.* at 10:23-24.

At that time, all agreed that the answer was no. Counsel for Detroit conceded that Detroit had "not presented an affidavit with that information." *Id.* at 13:13-14; *id.*

---

[1] This brief generally assumes the Court's familiarity with the Population Estimates Program and with the earlier stages of this (and related) litigation, all of which is also described in detail in Defendants' first summary-judgment brief, ECF No. 32.

at 16:8-11 ("[T]he answer is, no, we don't have an affidavit in the record.  We should have an affidavit in the record, and we can have an affidavit in the record, but we don't have it today.").  So the Court held that "the current record in front of me is not sufficient to carry the City's burden on standing." *Id.* at 41:20-21; *id.* at 42:1-5 ("[T]here has to be evidence showing that these alleged undercounts actually impacted funding and that the remedy that the City seeks would actually impact funding.  And Mr. Fink has candidly acknowledged that evidence is not before me today.").

The next question was "what to do about that." *Id.* at 42:6.  Counsel for Detroit "ask[ed] the Court whether the City can produce something after today's hearing." *Id.* at 13:21-22; *see also id.* at 15:21-25 ("[T]o be both intellectually honest and practical here, I really have to ask the Court's indulgence to see if the Court would allow us additional time.  I don't mean this afternoon, of course.  We can get that affidavit.  We have that evidence.").  Defendants argued that "the appropriate remedy is dismissal for lack of subject-matter jurisdiction." *Id.* at 36:21-22.

The Court ultimately predicted that "the case would just be refiled tomorrow" in the event of a dismissal without prejudice, which the Court explained "doesn't seem very practical." *Id.* at 42:9-10.  So, over the government's objection, the Court explained that "we're going to go back to a couple squares earlier in the case" and "allow for a period of expert discovery" on Article III standing. *Id.* at 42:11-15.  Later that day, the Court issued an order to "allow the parties to conduct expert discovery in order to develop an evidentiary record on the issue of standing."  Order at 1-2, ECF No. 39.

On February 21, 2025, Detroit produced expert reports from two witnesses: David A. Swanson and Jeffrey D. Morenoff.  *See* ECF Nos. 50-3 ("Swanson Report"),

50-4 ("Morenoff Report").  Defendants deposed Dr. Morenoff and Dr. Swanson on May 8 and May 9, 2025.  *See* Ex. 2 ("Morenoff Dep."); Ex. 3 ("Swanson Dep.").  On March 28, 2025, Detroit served eleven Requests for Admission, to which Defendants served objections and responses on May 8, 2025.  The government served the expert disclosure and declaration of Michael D. Starsinic on July 16, 2025.  Ex. 4 ("Starsinic Decl.").  Detroit deposed Mr. Starsinic on August 13, 2025.  Ex. 5 ("Starsinic Dep.").

## **ARGUMENT**

Over the government's objection, the Court offered Detroit a second chance to carry their burden on standing.  Detroit has largely squandered that opportunity.  Although the City has now introduced some expert testimony on some of the issues relevant to Article III standing, the core problems discussed at the prior motions hearing remain unresolved.  Detroit still largely ignores effects on other jurisdictions— especially other low-income cities like Detroit—that would result from making the methodological changes that they demand in this lawsuit.  Moreover, Detroit's experts analyzed only a single year of data—an indefensible methodological failing that undermines any conclusions that might otherwise be drawn, given the significant year-over-year variation in these data.  To make matters worse, that one year of data covers only a year that is not even at issue in this suit.  The uncertainty created by these errors means that it remains entirely unclear whether Detroit has been injured (rather than benefited) by the Census Bureau's county control method, or whether Detroit would be better (or worse) off if it were eliminated.  Because Detroit bears the burden to show standing, that continued uncertainty is fatal to this suit at the summary-judgment stage.

I.      **Detroit has still not carried its burden to demonstrate Article III standing.**

    a.      **Detroit continues to ignore effects on other jurisdictions.**

      **i.**   It remains unclear whether Detroit has suffered any concrete and particularized Article III injury because of the county-control method, or whether eliminating that method would increase Detroit's share of federal funding.  Among other reasons, that is because, if the agency's methodology were different, then Detroit's estimated population *and* that of every other city would change.  As explained in Defendants' prior filings, it is undisputed here that federal funding is generally a zero-sum game—so the key question is not Detroit's total population standing alone, but its population *relative to other cities* that are competing for the same funds.  *See, e.g.*, 42 U.S.C. § 5306(b)(1)(A) (considering "the ratios between . . . the population of that city and the population of all metropolitan areas," not raw totals, for certain funding).  Put differently: the overall size of the federal-funding pie is not going to be affected by the outcome of this lawsuit.[2]  So Detroit's proportional slice of that pie could either get bigger or smaller or stay the same—depending on how any change to Detroit's population estimates compares to changes to other cities' estimates.  The Court correctly identified and explained this problem at the summary-judgment hearing:

> **THE COURT:** I guess -- look, this is for an expert, not for me, but I'm not sure I follow that. If you start from the premise that each of these government programs has a set amount of funding. So I do best with small numbers. So we say the particular government program that you guys are saying is impacted here, they have $100 that is available for

---

[2]  Plaintiffs' lead expert, Dr. Morenoff, has acknowledged this in prior academic work discussed at his deposition.  *See* Morenoff Dep. at 169:4-6 ("For the most part, census-derived data don't determine the size of the pie but who gets what slice of pie.").

> every community in the nation. And we get rid of the county cap and Detroit's population goes up five people, and Flint goes up 10,000, and other poor communities with high minority populations go up by a much greater percentage than Detroit, even though Detroit goes up in absolute numbers, it's, at least theoretically, possible, and the government is hammering this point, that its share of federal funding would go down. That's all the more reason the government says you guys need an evidentiary link to get you to the injury here, in terms of the funding. That the government says it's not enough to show that your population would go up, you have to show that as yours goes up relative to what would happen to other communities, your funding would go up, too.

MSJ Hearing at 20:15-21:8. Then, turning from substance to process, the Court spoke

directly to what counsel for Detroit had to do to solve this problem:

> **THE COURT:** You may or may not disagree with that, but in the interest of not hiding the ball, that's another thing that I was thinking about. And if you get an affidavit that doesn't account for this possibility of what would happen in other communities and how this federal pot would be affected if they all went up somewhat, I think the government is going to come back and make the same argument. So it's just something to think about, so if I ask it at another hearing, you are not blindsided by it.

*Id.* at 21:8-17.

Despite the clarity of that message, nine months later, Detroit did exactly what

the Court warned against: it "g[o]t an affidavit that doesn't account for this possibility."

*Id.* So "the government" now "come[s] back and make[s] the same argument." *Id.* In

short, depending on how Detroit may (or may not) differ from other similar

jurisdictions—including other similar low-income cities—it is possible that Detroit

benefits, rather than suffers harm, from the county-control method. This very real possibility is not meaningfully addressed by either of Plaintiff's experts.

**ii.** Start with Dr. Morenoff. During his deposition, Dr. Morenoff repeatedly explained that he "did not view" his "charge as making specific conclusions about Wayne County" or Detroit in particular. Morenoff Dep. at 50:15-16; *see also id.* at 49:25-50:4 ("I understood my charge as not to focus specifically on Wayne County only in understanding if there was a relationship between tax filing status and migration, but to look at a broad range of counties."). That description by Dr. Morenoff is consistent with his report, which limits its key conclusions to "counties with median incomes below the median U.S. household income," on average, as compared with "counties with median incomes above the median U.S. household income," on average. Morenoff Report at 19. But Dr. Morenoff offers no opinion at all about variation *within* those two groups (*e.g.*, how low-income counties compare to each other), and no opinion at all about Wayne County or Detroit, specifically.[3]

Then, despite the centrality of this issue at the motions hearing, Detroit relegates the subject to one footnote of its summary-judgment brief: asserting that Dr. Morenoff "concluded that Detroit would benefit from a wholesale elimination of the County Control Rule since the population estimates of cities in lower-income counties would increase relative to cities in higher-income counties due to elimination of the bias caused

---

[3] Dr. Morenoff's opinion is as follows: "Estimates of county-level net domestic migration rates computed only on data from expected tax filers *overstate* population loss due to migration in counties with median incomes below the median U.S. household income and *understate* population loss due to migration in counties with median incomes above the median U.S. household income." Morenoff Report at 19.

by omitting non-filers from the migration data."  Pl.'s Renewed Mot. For Summ. J. at 25 n.4, ECF No. 50 ("Pl.'s Supp. Br.").  In fact, however, Dr. Morenoff said nothing at all about whether "*Detroit* would benefit"—his opinion was, more generically (as the rest of the footnote explains), that "the population estimates of cities in lower-income counties would increase relative to cities in higher-income counties."  *Id.* (emphasis added); *accord* Morenoff Report at 19.

But even if that conclusion were sound, *but see* infra, Sections II, III  (explaining why it is not), that just raises a version of the exact same problem as before—albeit at one slightly lower level of generality.  There are many low-income counties like Wayne County—everywhere from El Paso County, Texas to Shelby County, Tennessee, to Bronx County, New York.  *See* Morenoff Report at 38-41 (Appendix C).  So even if Dr. Morenoff had conclusively demonstrated that the average low-income county differs from the average high-income county in the relevant sense, that doesn't address (let alone answer) the question of how low-income counties differ *from each other* (much less Wayne County, in particular).  And there remains zero evidence in the record to suggest that Wayne County would do better (or worse) than El Paso County or Shelby County or Bronx County or any of the many other low-income counties, in the absence of the county control.  So there is likewise no basis to conclude that Detroit would get more federal funding if it won this suit.  And in fact, Detroit might do worse—if, for example, the concerns raised by Detroit in this lawsuit about undercounts in low-income cities with high minority populations are similar (or even more pronounced) in other low-income cities with high minority populations.

That is a very real possibility. As common-sense dictates, and as Mr. Starsinic also explains, "features about any one MIGPUMA (such as the fact that it has a large auto industry) could make the trends for that MIGPUMA to be different from trends in the average MIGPUMA."[4] Starsinic Decl. ¶ 28. And Dr. Morenoff (unsurprisingly) never asserts that all low-income counties would be affected in exactly the same way— only that he would expect to find overall differences between high-income and low-income counties, on average. Indeed, in his prior academic work about the Census, Dr. Morenoff has emphasized features that make Detroit unique and something of an outlier, at least on some census-related issues. *See, e.g.*, Morenoff Dep. at 172:1-10 (discussing how "Detroit is one of the least connected big cities in the country" and so "it was no surprise that Detroit had the lowest Census 2020 self-response rate among the 50 largest cities in the United States"). For that and many other reasons, data about all "low-income counties" across the country is ill-suited to drawing firm conclusions about Detroit, in particular. *See* Starsinic Decl. ¶ 28 (discussing "synthetic bias").

At the prior hearing, it turns out that the Court chose examples presciently, in explaining how Detroit's "share of funding could go down if, for instance, there's a set amount of money and getting rid of the county cap means that Houston and Las Vegas and New York go up by a much higher percentage than Detroit." MSJ Hearing at 19:11-15. According to Dr. Morenoff, Clark County, Nevada, Harris County, Texas, and Bronx County, New York are all low-income counties—and thus are identically

---

[4] Dr. Morenoff's report uses the acronym "MIGPUMA" to mean an "ACS Migration Primary Use Microsample Area." Morenoff Report at 3. Wayne County, Michigan is a MIGPUMA. Other MIGPUMAs cross county lines.

situated to Wayne County for purposes of his analysis. *See* Morenoff Report at 38-41 (Appendix C). So the Court's key question remains unanswered.

**iii.** As for Dr. Swanson, to the extent he addresses this issue at all, his opinion is entirely parasitic on Dr. Morenoff's. *See* Swanson Report at 27 ("In support of this opinion, I note the analysis of migration rates produced using IRS data in the expert report of Professor Jeffrey Morenoff . . . ."). Dr. Swanson never conducted his own analysis of this issue, nor cites anything other than a (draft) report from Dr. Morenoff, which was apparently shared with him by Detroit's litigation counsel. *See* Swanson Dep. at 163:24-165:15 (Dr. Swanson referencing Dr. Morenoff's draft, and saying that it is "absolutely correct" that his "report does not itself provide analysis of what would happen if the [county control] was discontinued nationwide"). So, Dr. Swanson's report offers no independent basis to resolve the question raised by the Court last December, about how effects on other jurisdictions might undermine Detroit's theory of standing. Instead, Detroit's factual showing on this issue must rise and fall with Dr. Morenoff's analysis—which, as discussed above, largely ignored the critical question.

**iv.** Detroit seems to recognize this problem. But rather than retaining an expert that would answer the key *factual* question about Detroit—an approach that, of course, risks yielding an inconvenient answer—it instead turns to a new *legal* argument, raised for the first time in its supplemental summary-judgment brief. In Detroit's view, the Court's "concern has now been definitively answered by the Supreme Court's recent decision in *Trump v. CASA, Inc.*, [606 U.S. 831] (2025), in which the Court set limits on the issuance by district courts of nationwide injunctions." Pl.'s Supp. Br. at 26. How so? According to Detroit, under *CASA*, it "seeks relief only as to itself," so that the

Court can simply ignore the fact that eliminating the county control nationwide might harm (rather than help) Detroit, due to effects on other jurisdictions. *Id.*

For the most part, Defendants welcome that remedial concession—notwithstanding some broader language in Detroit's complaint that could be read as seeking nationwide relief. *See, e.g.*, Compl., Prayer for Relief ¶ 3 ("Hold unlawful and set aside the Bureau's application of the County Cap rule"). Even so, *CASA*—an opinion about the proper scope of equitable remedies under the Judiciary Act of 1789—does not solve Detroit's highly fact-specific standing problem here, for several reasons.

First and most importantly, Detroit's argument about *CASA* is premised on the assumption that the only standing defect in this case is about redressability: that is, whether "the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). That assumption is mistaken. The first question in analyzing Article III standing is whether the plaintiff has "suffered an 'injury in fact.'" *Lujan*, 504 U.S. at 560. And if it is true that application of the county control is currently helping (rather than harming) Detroit, then Detroit has not suffered any injury-in-fact. So the Court would never even need to reach the distinct and secondary question of what the appropriate remedy is, nor whether that hypothetical remedy would redress a (non-existent) injury. That is fatal to Detroit's reliance on *CASA* to solve its evidentiary problem here: if it has not suffered an injury in fact, Detroit lacks standing—regardless of the scope of any possible future remedy.

Second, more generally, Detroit's argument conflates two distinct questions: (1) what the remedy would be if Detroit prevailed in this suit, and (2) whether Detroit has adequately demonstrated that it has Article III standing to bring this suit in the first

place.  Detroit's analysis is backwards—courts typically do not decide on the scope of relief until *after* a Plaintiff has not only established standing, but also demonstrated entitlement to relief on the merits.  It would be odd for this Court to skip ahead multiple steps to that remedial question now, all in service of patching up a factual hole in Detroit's evidentiary showing on Article III standing.

Third, even focusing on redressability alone, Detroit overstates the simplicity of the remedial question.  To be clear, Defendants have no desire to talk anyone out of a narrow remedy, if Detroit one day prevails in this case.  Even so, in candor to the Court, Defendants must acknowledge a large wrinkle that Detroit's filing ignores: in *CASA*, the Supreme Court explicitly reserved decision on the scope of relief available on APA claims like these.  *See* 606 U.S. at 847 n.10 ("Nothing we say today resolves the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action.  *See* 5 U.S.C. § 706(2) (authorizing courts to 'hold unlawful and set aside agency action').")*; compare* Compl., Prayer for Relief ¶ 3 (asking the Court to "[h]old unlawful and set aside the Bureau's application of the County Cap rule").

Although the position of the Department of Justice is that party-specific relief is generally also appropriate under the APA (for similar reasons as under the Judiciary Act of 1789), that question is currently being litigated in many courts around the country.  *See, e.g.*, *City of Columbus v. Kennedy*, 2025 WL 2426382, --- F. Supp. 3d ---, at *34 (D. Md. Aug. 22, 2025) ("[T]he Court finds, in line with other recent cases addressing the issue, that the limiting principle on universal or national injunctions announced in *CASA* does not apply to APA cases.") (collecting cases), *appeal filed*, No. 25-2012 (4th Cir. Aug. 29, 2025).  Perhaps this Court will never need to decide that issue—either because the

13

United States prevails, or because Detroit seeks only narrower relief—but to say that the Court's fact-specific concerns about the evidentiary record on standing are "definitively answered" by *CASA* is incorrect.  Pl.'s Supp. Br. at 26.

Fourth, as explained in greater detail in Defendants' prior summary-judgment briefs, "were the Census Bureau forced to create bespoke methodologies that varied around the country, the (already quite challenging) process of preparing annual population estimates would no longer be 'feasible' at all.  13 U.S.C. § 181(a)."  Defs.' Opp'n to Pl.'s MSJ at 25, ECF No. 34.  And "such variation would also greatly reduce the value of the estimates to those who study these numbers on a nationwide basis." *Id.* at 26.  And so, for example, one option that would be available to the Census Bureau—even if the Court ordered relief for Detroit alone—would be to acquiesce in that (hypothetical) ruling and abandon the county-control method nationwide.  After all, on that hypothetical, the Court would have decided that the county control is not only imperfect, but so irrational as to be unlawful under the APA.

To be clear, that would be a problematic outcome for all the reasons advanced in Defendants' prior briefs: most notably, because the county control improves the accuracy of Census Bureau's population estimates, at least on average.  *See* Defs.' MSJ at 22-27.  But a Detroit-specific remedy would also be problematic, for different but also very important reasons, such as the ability of researchers to make "apples-to-apples statistical comparisons between cities across the county—which would be impossible if they were measured using different methods."  Defs.' Opp'n to Pl.'s MSJ at 26. Ultimately, it would be up to the Census Bureau to decide how to respond to an order from this Court providing party-specific relief to Detroit in this case, by balancing those

policy considerations at the core of the agency's expertise. Detroit should not be permitted to short-circuit that process for tactical reasons during briefing about the distinct, threshold issue of Article III standing.

> **b.    Detroit has only offered evidence about a single year—a year that is not even at issue in this litigation.**

**i.** The arguments in Section I(a), above, all started from the premise that Dr. Morenoff has established some meaningful distinction between low-income and high-income counties, on average, and explains why—even if Dr. Morenoff is correct—that still doesn't address (let alone answer) the question of whether *Detroit* is injured by the county-control method, or would do better or worse in its absence. But it turns out that Dr. Morenoff's threshold premise lacks any sound statistical basis, because of the curious choice to only use one year of data to support his opinions.

It is undisputed that, in his report, "Dr. Morenoff analyzes only a single year of data (migration between 2022 and 2023)." Starsinic Decl. ¶ 8. That is a problem because, year over year, "domestic migration patterns often change in response to myriad factors that vary across the country." *Id.* ¶ 6. Dr. Morenoff conceded as much in his deposition. *See* Morenoff Dep. at 102-03 (agreeing that "patterns of domestic migration in the United States are variable from one year to the next"); *id.* at 86:13-15 ("[T]here is significant regional variation that's not directly addressed in the analysis that we've done for this report."). On this point, Dr. Morenoff and Mr. Starsinic agree. *See* Starsinic Dep. at 56:2-3 (explaining that these data "can vary quite a bit from year to year and area to area").

As Mr. Starsinic explains, "[b]ecause of the variable and quickly reactive nature of this component of change, it is crucial to analyze multiple years of data to make sure that any conclusions are not skewed by unrepresentative results." Starsinic Decl. ¶ 7. "At a minimum," Dr. Morenoff's "analysis should be expanded to include several more years of data before firm conclusions are drawn." *Id.* ¶ 8. Because he instead only considered one year of data, "[t]here is no way to know if his conclusions hold true for domestic migration patterns over time." *Id.*; *accord* Starsinic Dep. at 64:18-20 ("I don't know what the result would have been if Dr. Morenoff had run this analysis on 2022 data."). A methodology that increases Detroit's population estimates in one year might reduce it the next year, or vice versa.[5]

**ii.** It gets worse. Even if it were methodologically sound to draw these sorts of conclusions based on a single year of data, Detroit's experts picked the wrong year.

As a reminder, this lawsuit challenges the Vintage 2021 and Vintage 2022 population estimates for the City of Detroit (released in 2022 and 2023). Those are the only two years for which Detroit pursued administrative remedies and now seeks relief in this suit. *See, e.g.*, Compl. ¶ 44 (challenging alleged "undercounts of the City's population in 2021 and 2022"). The Vintage 2023 estimates (released in 2024), by contrast, were the subject of jubilant press releases from the City, *see* City of Detroit,

---

[5] This might explain why, outside of this litigation, when Dr. Morenoff has submitted abstracts of academic articles based on this very same analysis, he has qualified his opinions far more heavily than he does for purposes of his role in this litigation. *Compare* Morenoff Dep. at 163:11-164:12 (quoting abstract: "These results suggest that relying on IRS data *may* overstate net migration in higher-income counties and understate net migration in lower-income counties.") (emphasis added), *with* Morenoff Report at 19 (saying essentially the same thing but without the word "may").

*Detroit grows in population for the first time in decades*, May 16, 2024 Press Release, https://perma.cc/W8E5-XV7Y, were not the target of any administrative challenge, and are not the basis for this lawsuit (which was filed before they were released)—though the county control was used in exactly in the same way in 2023.  In any event, to establish standing to challenge the population estimates for 2021 and 2022, any expert analysis should have covered—at an absolute minimum—2021 and 2022.

Inexplicably, neither Dr. Morenoff nor Dr. Swanson relied on data from 2021 or 2022 in their reports—both were focused on 2023 data alone.  Again, this is undisputed:

> **Mr. Pezzi:** So, is it fair to say that all of your conclusions are based on 2023 data?
>
> **Dr. Morenoff:** Yes, it's based on movement patterns from 2022 to 2023.
>
> **Mr. Pezzi:** And by the same token it is not based on, for example, movement patterns from 2020 to 2021 or 2021 to 2022?
>
> **Dr. Morenoff:** Yes, it's fair to say we don't generalize to other time periods.
>
> **Mr. Pezzi:** And so you aren't offering any opinions in this case about the time period of 2021 to 2022, correct?
>
> **Dr. Morenoff:** No specific opinions about those time – I'm not offering any specific opinions about time periods other than the one that I'm studying.
>
> **Mr. Pezzi:** And that's ACS data about moves between 2022 and 2023?
>
> **Dr. Morenoff:** That's correct.

Morenoff Dep. at 107:3-20; *see also id.* at 104:6-8 ("[W]e used data from a single year of

the American Community Survey, and that year is 2023."); Swanson Dep. at 45:2-3 ("We focused on 2023. That's really what is in the report, the 2023 analysis."); Pl.'s Supp. Br. at 16 ("[I]t is true that the data analyzed by Professor Morenoff is from the 2023 ACS (reflecting migration from 2022 to 2023)."). When asked why, Dr. Morenoff said that "[p]art of it was expediency, just trying to get this done." Morenoff Dep. at 104:17-18. Dr. Swanson said that "it was the most current population estimates available at this time." Swanson Dep. at 94:17-24.

But there is no basis to assume—and Detroit's experts do not even assert—that any effect that Dr. Morenoff identified with respect to 2023 would necessarily apply to any or all other years. To the contrary, as discussed above, given the significant year-over-year variation in these numbers, that assumption would be baseless—which is presumably why Dr. Morenoff is (as he conceded) "not offering any specific opinions about time periods" other than 2023. Morenoff Dep. at 107:16-17. Plaintiff's summary-judgment brief likewise argues repeatedly that "an increase in the City's 2023 population estimate" would lead to "additional federal funding to Detroit." Pl.'s Supp. Br. at 16. But whether or not that is true, this lawsuit does not even challenge "the City's 2023 population estimate." *Id.*

To the extent Dr. Morenoff said anything at all about 2021 and 2022, it was to identify plausible reasons that those years might significantly *differ* from 2023. For example, Dr. Morenoff noted in his deposition that "if we went back in time and started looking at pandemic data, which I have not done and I have no idea what the results would show, I would not feel as confident about those circumstances generalizing to the circumstances that counties face now in the post-pandemic period." Morenoff Dep.

18

at 105:8-14.  Of course, 2021 and 2022—the years at issue in this lawsuit—surely included large amounts of what Dr. Morenoff calls "pandemic data," about which he apparently has "no idea what the results would show" and about which he "would not feel as confident about those circumstances generalizing to the circumstances" described in his analysis.  *Id.*  That is a powerful indictment of his own report—or, at the very least, of its usefulness to this litigation about 2021 and 2022.

**iii.**  In its brief, Detroit says that "Mr. Starsinic does not present any evidence to suggest that that year [*i.e.*, 2023] is somehow unrepresentative."  Pls.' Supp. Br. at 16.  But that argument flips standing doctrine on its head—Plaintiff bears the burden on this issue, not Defendants.  And Dr. Morenoff is the one trying to prove something about 2021 and 2022, not Mr. Starsinic.  In any event, the argument is refuted by Detroit's own brief, which explicitly argues (citing Mr. Starsinic) that pre-2023 data "were likely affected by the Covid pandemic."  *Id.*  Again, if anything, that proves *Defendants'* point, which is that using one year of data is inappropriate for this sort of analysis—especially where, as here, the years in question are 2021 and 2022, which themselves are very much part of the core COVID era.

**c.**    **Dr. Morenoff did not properly account for margins of error.**

Even if Detroit could overcome all the issues above, Dr. Morenoff also made basic statistical errors in how he analyzed these data, as explained in detail by Mr. Starsinic.  In short, Dr. Morenoff's report "features errors based on a failure to take sampling variability" and "sampling error" into account.  Starsinic Decl. ¶ 10.

This problem originates with the fact that all of Dr. Morenoff's conclusions are based on survey data from the 2023 American Community Survey (ACS).  Unlike the

decennial census—which strives to be an "actual enumeration" of all persons living in the United States, U.S. Const. art. 1, § 2, cl. 3—"[t]he ACS is an annual nationwide *survey* conducted every month sent to a *sample* of addresses in the 50 states, the District of Columbia, and Puerto Rico." Starsinic Decl. ¶ 11 (emphases added). "The ACS samples about 3.5 million housing unit addresses each year, with completed interviews conducted for a little less than 2.0 million housing units in 2023." *Id.* ¶ 12.

Although it is a relatively large survey, it is still a survey, sent only to a small sample of the overall population. And so, "[i]n order to be transparent with users" about the limitations of this sort of survey data, "estimates from the ACS . . . are accompanied by a margin of error (MOE) based on a 90 percent confidence level." *Id.* "This gives users a measure of the sampling error associated with each estimate and allows users to evaluate the accuracy and reliability of the data produced." *Id.*

Dr. Morenoff didn't even use the primary set of ACS data, however. He used "the ACS Public Use Microdata Sample (PUMS)," *id.* ¶ 10, which is "a subsample of the full ACS, thus creating additional sampling error for PUMS estimates beyond the published ACS estimates," *id.* ¶ 13. "Because estimates based on PUMS are created by data users themselves, the data users must likewise calculate MOEs for their estimates themselves." *Id.* ¶ 14. "Instructions and the variables needed to calculate the MOEs are provided for users" on the Census Bureau's website. *Id.*

Here is the problem: "there is no indication in Dr. Morenoff's report that he calculated the MOEs." *Id.* And in his deposition, he seemed not to know about this critical step, nor the instructions provided by the Census Bureau in how to do so. *See* Morenoff Dep. at 136:13-20 (Dr. Morenoff: "This actually does not sound familiar to

20

me . . . . I'm not very familiar with this method."). This oversight undermines most of the conclusions that he reached in his report.

For example, although "Tables 2 and 3 and Figures 2 through 6 of Dr. Morenoff's report" use various "[l]ogistic regression models," these analyses "only include error based on the model, and do not include any sampling error." Starsinic Decl. ¶ 15. As Mr. Starsinic explains, properly "taking sampling errors into account may weaken or even reverse some of the conclusions reached in Dr. Morenoff's report based on those logistic regression models." *Id.* ¶ 16.

Similarly, "[t]he crux of the report's argument" is that "estimates of the Filer and Non-Filer net domestic migration rates shown in the Appendix C table are different." *Id.* ¶ 18. But as Mr. Starsinic explains, "that is not adequately demonstrated, and in fact can't be adequately demonstrated without calculating the MOEs of the rates." *Id.* "Including the sampling error in this analysis is key to determining how accurate his rates are, and thus what conclusions can be drawn from them." *Id.* ¶ 20.

Moreover, as Mr. Starsinic's analysis demonstrates, "many of" Dr. Morenoff's calculations appear to "hav[e] an MOE larger than the absolute value of the rate," which means that "the rate is not significantly different from zero at the 90 percent confidence level," such that one "cannot say with statistical confidence that the rate is either positive or negative." *Id.* ¶ 22; *see also id.* at 14-17 (Appendix A).

Ultimately, when Mr. Starsinic himself approximated the MOEs that Dr. Morenoff failed to calculate, he was able to test "each pair of rates"—*i.e.*, for filers and non-filers—in each county, "to see if they are significantly different from one another." *Id.* ¶ 25. "[I]n most cases—69 out of the 103 counties—they are not." *Id.* "Of the 34

that are significantly different, the Filer rate is higher in 18 counties, and the Non-Filer rate is higher in 16." *Id.* "As a result, it is not clear from Dr. Morenoff's report whether the net domestic migration rate is different for Filers vs. Non-Filers given the lack of significant differences once sampling error is taken into account, or (even if different) which group has a higher rate." *Id.*

Accordingly, because Dr. Morenoff failed to adequately account for sampling error, he has not justified the key opinions that he has offered in this case[6]—opinions that, even if true, do not even establish that Detroit has been injured.

## II.   <u>The appropriate remedy is dismissal.</u>

For these reasons, Detroit has not carried its burden to show Article III standing at the summary-judgment stage. *See e.g., Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411-12 (2013) ("The party invoking federal jurisdiction bears the burden of establishing standing—and, at the summary judgment stage, such a party can no longer rest on mere allegations, but must set forth by affidavit or other evidence specific facts.") quoting *Lujan*, 504 U.S. at 561)). The appropriate remedy for that failure is dismissal. *See, e.g., Lujan*, 504 U.S. at 578 ("We hold that respondents lack standing to bring this action and that the Court of Appeals erred in denying the summary judgment motion filed by

---

[6] This is the only argument in this brief for which expert testimony is truly necessary. So although Defendants disagree with Plaintiff's criticisms of Mr. Starsinic's expertise, *see* Pl.'s Supp. Br. at 19-20, most of those criticisms are immaterial. Detroit does not seem to dispute (nor could it) that Mr. Starsinic has enormous expertise on the narrow issues on which he was asked by Defendants to opine in this case: in particular, how to properly analyze and interpret estimates from the Public Use Microdata Sample (PUMS) from the American Community Survey. *See* Starsinic Decl. ¶¶ 1-3. And Plaintiff has (unsurprisingly) not made any sort of *Daubert* challenge.

the United States."). After all, "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).

At the previous summary-judgment hearing in this case, the Court decided to give Detroit a second chance to carry its burden, in an accommodation to the practical reality (and counsel for Detroit's explicit representations) that a dismissal without prejudice was all-but-certain to result in Detroit promptly refiling this suit. But the Court need not (and should not) favorably exercise its discretion again, to rescue Detroit from its own evidentiary shortcomings a second time. Instead, the Court should dismiss this case, as required by Article III of the Constitution and the Federal Rules of Civil Procedure—regardless of how Detroit may respond to that dismissal.

## CONCLUSION

For the reasons stated in this brief and in Defendants' prior summary-judgment briefing (all of which is incorporated here by reference), the Court should dismiss this suit for lack of subject-matter jurisdiction or, in the alternative, enter summary judgment for Defendants on all remaining claims.

Date: November 26, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

STEPHEN M. ELLIOTT
Assistant Branch Director
Federal Programs Branch

/s/ Stephen M. Pezzi
STEPHEN M. PEZZI
 Senior Trial Counsel
TAYLOR PITZ
 Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Tel: (202) 305-8576
Email: stephen.pezzi@usdoj.gov

*Counsel for Defendants*