UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CITY OF DETROIT,

    Plaintiff,

v.

                                   Case No. 24-cv-10775
                                   Hon. Matthew F. Leitman

UNITED STATES DEPARTMENT
OF COMMERCE, *et al.*,

    Defendants.

_____/

## ORDER (1) GRANTING DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT (ECF No. 59) AND (2) DENYING PLAINTIFF'S RENEWED MOTION FOR SUMMARY JUDGMENT (ECF No. 50)

Many Americans are familiar with the decennial census – the counting of people living in the United States that takes place every ten years and that is used for, among other things, the apportionment of electoral votes and seats in the United States House of Representatives. What some people may not know is that in between each decennial census, the United States Census Bureau undertakes several other population surveys. The population estimates from those surveys often determine how federal funds are allocated.

This case is about those intra-decade population surveys. Plaintiff City of Detroit claims that the methods the Defendants used during the Biden Administration to conduct some of those surveys undercounted the City's

1

population, and the City says that it lost federal funding based on that undercount. The City's critiques of the Census Bureau's methods are well presented and fair. Indeed, the Census Bureau concedes that its methods for estimating population are imperfect, and the Census Bureau has even agreed to adjust the City's population estimates based upon some of the City's arguments.

But the City and the Census Bureau remain at odds about one particular tool that the Census Bureau uses to estimate the City's population.  That tool is sometimes called the "County Control Rule."  Under that rule – which the Court describes in greater detail below – the Census Bureau adjusts the estimated population of each individual municipality in Wayne County so that the sum total of all of the estimated municipal populations in the County matches the estimated population total of the County (which is estimated using different data than that used to estimate the populations of the individual municipalities within the County).  The City claims that adjusting the municipal populations in this manner artificially depresses its population estimate (and those of the other municipalities in Wayne County).  That happens, the City says, because the Census Bureau's methodology for estimating Wayne County's population results in an artificially low estimate for the County's population, and that, in turn, causes an unwarranted decrease in the population estimates for all of the municipalities in the County – including the City – when those estimates are adjusted to match the erroneously-low County total.  The

2

City says that the flawed downward adjustment of its population estimate under the County Control Rule has led to the loss of federal funding.

In this action, the City claims that the Census Bureau's use of the County Control Rule (1) is arbitrary and capricious and therefore unlawful under the Administrative Procedures Act (the "APA") and (2) amounts to intentional race discrimination in violation of the Due Process Clause of the Fifth Amendment.[1]

The parties have now filed cross-motions for summary judgment on the City's claims challenging the County Control Rule. (*See* Mots., ECF Nos. 50, 59.)  For the reasons explained below, the Court concludes that the Census Bureau's use of the County Control Rule is neither arbitrary and capricious nor intentionally discriminatory.  The Court therefore **GRANTS** Defendants' motion for summary judgment and **DENIES** the City's motion.

---

[1] The Due Process Clause of the Fifth Amendment has been interpreted by the Supreme Court to include a guarantee of equal protection of the laws commensurate with the Equal Protection Clause of the Fourteenth Amendment. *See, e.g.*, *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) ("The Fifth Amendment, of course, does not itself contain a guarantee of equal protection, but instead incorporates, as against the federal government, the Equal Protection Clause of the Fourteenth Amendment") (citing *Bolling v. Sharpe*, 347 U.S. 497, 500 (1954)).

**I**

**A**

The United States Census Bureau is a department within the United States Department of Commerce. *See* 13 U.S.C. § 2. It is most well-known for conducting the decennial census – a survey that seeks to count every person living within the United States every ten years. *See* 13 U.S.C. § 141; U.S. Const. art 1, § 2, cl. 3. This case does not involve the decennial census.

Instead, this action arises out of different population surveys that the Census Bureau undertakes in the years between each decennial census. Federal law requires that "[d]uring the intervals between each [decennial] census of population […], the [Census Bureau], to the extent feasible, shall annually produce and publish for each State, county, and local unit of general purpose government which has a population of fifty thousand or more, current data on total population and population characteristics." 13 U.S.C. § 181(a).

These intra-decade population surveys are undertaken as part of the Census Bureau's "Population Estimates Program." *See* U.S. Census Bureau, *Population & Housing Unit Estimates*, https://perma.cc/ZKP6-KWG8. Instead of counting each person living in the United States, the Population Estimates Program "begins with the most recent decennial census" and then adjusts that data based on "current data on births, deaths, and migration … [to] produce a time series of estimates of

4

population, demographic components of change, and housing units."  U.S. Census Bureau, *Population & Housing Unit Estimates (About)*, https://perma.cc/XA9Y-YLWM.  The population estimates derived from the Population Estimates Program "are typically released in the calendar year following the year for which the population is estimated." (Compl. at ¶ 55, ECF No. 1, PageID.14-15.)  When a new population estimate is released, the Census Bureau also "revises" its prior population estimates. (*Id.* at ¶ 55 n. 4, PageID.15.)

After the yearly population estimates are released, the Census Bureau "provide[s] governmental units the opportunity to seek a review of and provide additional data for these estimates and to present evidence relating to the accuracy of the estimates." 15 C.F.R. § 90.2.  That administrative appeals process, known as the Population Estimates Challenge Program, allows "a city [to] challenge its population estimate by submitting additional data to the Census Bureau for evaluation." (Compl. at ¶ 57, ECF No. 1, PageID.15, citing 15 C.F.R. § 90 *et seq.*)

Once population estimates are completed, they are then "used as statistical inputs for census programs … that are directly tied to allocation formulas or eligibility criteria for programs that provide [federal] funding." (*Id.* at ¶ 117, PageID.34.)  "At least 353 federal assistance programs use[] Census Bureau data to distribute federal funds … Some of the top programs funded healthcare, nutrition,

highways, housing, school lunches, childcare, and COVID assistance." (*Id.* at ¶ 118, PageID.34.)

**B**

In May 2023, the Census Bureau released what it called its "Vintage 2022 Population Estimate" for the City based on data collected from the Population Estimates Program.  At that same time, it also released its revised "Vintage 2021 Population Estimate" for the City.  The Census Bureau estimated that the City's population for 2021 was 628,167. (*See* Admin R., ECF No. 24, PageID.2782.)  For 2022, the Census Bureau estimated the City's population was 620,376. (*See id.*) These population estimates were then used to calculate the City's entitlement to certain federal funds. (*See, e.g.*, Compl. at ¶ 120, ECF No. 1, PageID.35.)

**C**

The City disagreed with the Census Bureau's population estimates.  It therefore filed an administrative appeal through the Population Estimates Challenge Program.  In that appeal, the City raised several challenges to the Census Bureau's population estimates for 2021 and 2022. (*See* Aug. 16, 2023, Ltr., ECF No. 1-2.)

**1**

First, the City argued that the Census Bureau wrongly "treat[ed] the demolition of abandoned homes as evidence of population decline" (the "Abandoned Home Challenge"). (Mot., ECF No. 33, PageID.3178.)  In that argument, the City

6

first observed that the primary way in which the Census Bureau calculated the City's population was to (1) count the number of housing units in the City and (2) multiply the number of housing units by the "average number of people living in each housing unit in Detroit per the 2020 census." (*Id.*, PageID.3179.)  The City then noted that whenever it demolished any housing unit, the Census Bureau treated that demolition as evidence that the City's population was declining – even if that housing unit was long abandoned and nobody was living there anymore. (*See id. See also* Compl. at ¶ 13(a), ECF No. 1, PageID.4-5.)  The City further highlighted that after it "demolished more than 4,000 vacant and abandoned homes in 2021 and 2022 … the Census Bureau population estimate counted this as a net population loss of more than 8,000 people." (Aug. 16, 2023, Ltr., ECF No. 1-2, PageID.50.)  According to the City, its population estimate should not have been reduced by these amounts because the demolition of *vacant* homes did not accurately correspond to a loss in population.

**2**

Second, the City asserted that the Census Bureau "refuse[d] to include new housing units in its estimate if those new units [were] the product of construction or renovation for which the City of Detroit did not issue a permit" (the "Housing Permit Challenge"). (Compl. at ¶ 13(b), ECF No. 1, PageID.5. *See also* Aug. 16, 2023, Ltr.,

7

ECF No. 1-2, PageID.51.)  This too, the City said, led to a substantial undercount of its population. (*See id.*)

**3**

Finally, the City identified the County Control Rule as a third "factor" that "negatively affect[ed] the accuracy of [its] population estimates" (the "County Control Challenge").[2] (Aug. 16, 2023, Ltr., ECF No. 1-2, PageID.55.)  As noted above, the County Control Rule is the process through which the Census Bureau adjusts the population estimates of all sub-county governmental units within a county (*i.e.*, municipalities) so that the sum total of their population estimates equals the estimated total population of the county.  The Census Bureau makes the adjustment under the County Control Rule because the total initial population estimates for municipalities in a county rarely match the total estimated population for that county.  This mismatch occurs because the Census Bureau has access to different population data at the county level than at the municipal level.  More specifically, at the county level, the Census Bureau has access to data concerning, among other things, births, deaths, and migration between counties, and it uses that data to drive its county population estimates.  (The Census Bureau refers to this method of estimating county populations as the ADREC method.)  However, the

---

[2] The City acknowledged that the County Control Challenge fell outside of the Challenge Program's purview, but it nonetheless raised the issue in its administrative appeal to the Census Bureau.

8

Census Bureau does not consistently have access to the same data at the municipal level, so it primarily uses data concerning building permits and housing units – which are generally available at the municipal level – to calculate municipal population estimates.

The County Control Rule comes into play once the Census Bureau arrives at the non-matching estimates for (1) the population of a county and (2) the total population of the municipalities within that county. Under the rule, the Census Bureau applies a "rake factor" to the total population of the municipalities in order to harmonize them with the county's population (as calculated using the ADREC method). As the Defendants explain, the rake factor works as follows:

> The [Census] Bureau "divide[s] the … county-level household population estimate by the sum of the uncontrolled subcounty household population estimates within the county," and then "multipl[ies] this adjustment or 'rake factor' by the uncontrolled subcounty household population estimates calculated in" the first step. AR_1215. "This calculation produces the controlled subcounty household population estimate." *Id*. The controlled estimate may be either higher or lower than the uncontrolled estimate.
>
> As relevant here, for example: "[i]n Detroit's case," the "rake factor was .9885 for 2021 and .9785 for 2022," Compl. ¶ 112, because the county-level estimates [for Wayne County] were slightly lower than the sum of all the (uncontrolled) subcounty estimates [for all of the municipalities within Wayne County]. And so, "having arrived at an initial estimate of Detroit's population for each of those years" using the housing unit method, "the Census Bureau's final, published estimate was only

9

> 98.85% (for 2021) and 97.85% (for 2022) of the initial estimate, due to application of" [the County Control Rule]. *Id.*

(Mot., ECF No. 32, PageID.3158-3160. *See also* Admin R., ECF No. 20, PageID.1654; Admin R., ECF No. 24, PageID.2666-2667.)

In its administrative appeal, the City contended that the application of a rake factor under the County Control Rule led to an unduly-low estimate of its population. (*See* Aug. 16, 2023, Ltr., ECF No. 1-2, PageID.55.) That is so, the City said, because the ADREC method – used by the Census Bureau to estimate county population levels – led to a depressed population estimate for Wayne County. The City noted that the ADREC method uses federal income tax filings, among other data sources, to estimate migration rates into and out of counties, and the City said that the use of such filing data leads to an artificially low population estimate for low-income counties like Wayne County:

> The [Census] Bureau's county population estimates are not based on housing units. Instead, the Bureau focuses on migration rates, which it estimates using addresses reported on federal income tax returns. So, for example, if a household's tax returns show a Wayne County address in 2021 and an Oakland County address in 2022, the Bureau concludes that household has moved out of Wayne County. Since most low-income Americans are not required to file federal income tax returns—let alone tax returns in two successive years—this "Income Tax Filer Method" of estimating population guarantees that the movement of poor and minority Americans will be miscounted. As could be expected, the Income Tax Filer

10

Method causes a significant undercount of Wayne County's population.

(Mot., ECF No. 33, PageID.3182-3183; internal footnote omitted).

The City insisted that the application of the County Control Rule unreasonably "reduc[ed] its population estimate by 7,192 people for 2021 and by 13,407 people for 2022." (Compl. at ¶ 32, ECF No. 1, PageID.10.)

**D**

The Census Bureau responded to the City's administrative appeal on February 26, 2024. (*See* Admin. R., ECF No. 24, PageID.2782-2783.)  And it sustained a portion of the City's challenge.  More specifically, based upon the Housing Permit Challenge, it agreed to increase the 2021 population estimate for the City from 628,167 to 630,637 and increase the 2022 population estimate from 620,376 to 625,561. (*See id.*, PageID.2783.)  It declined to grant any other relief.

**E**

After the City received the Census Bureau's resolution of its administrative appeal, it filed this federal action against the United States Department of Commerce (which oversees the Census Bureau), the Secretary of that Department, the Census Bureau, and Robert Santos (who was then the director of the Census Bureau).  (*See* Compl., ECF No. 1.)  The City's Complaint contains the following four Counts:

- Count One is brought under the APA and is based on the Abandoned Home Challenge.  In that Count, the City claims that the "Defendants'

11

decision to treat the demolition of vacant, uninhabitable structures in Detroit as evidence of population loss [was] arbitrary, capricious, and an abuse of discretion." (*Id.* at ¶ 127, PageID.37.)

- Count Two is brought under the APA and is based on the Housing Permit Challenge. In that Count, the City asserts that "the Defendants' refusal to accept evidence of both permitted and non-permitted construction of new inhabitable housing units in Detroit" was "arbitrary, capricious, and an abuse of discretion" and did not comply "with Defendants' statutory and regulatory mandates to produce a current, comprehensive, and reliable estimate of the City's population." (*Id.* at ¶¶ 134, 136 PageID.38-39.)

- Count Three is brought under the APA and is based on the County Control Challenge. In that Count, the City states that the Defendants acted arbitrarily and capriciously when they "adopt[ed]" the County Control Rule. (*Id.* at ¶ 142, PageID.40.) The City additionally says that the Country Control Rule (1) "is contrary to [Defendants'] statutory mandate to produce reliable population estimates" and (2) "irrationally restricts adjustments to Detroit's population estimates that are otherwise supported by evidence." (*Id.* at ¶¶ 141-142, PageID.40.)

12

- Finally, Count Four is also based in relevant part on the County Control Challenge.  In the relevant parts of that Count, the City contends that the Defendants' adoption and application of the County Control Rule amounts to intentional race discrimination against the City's Black and Hispanic residents in violation of the Due Process Clause. (*See id.* at ¶¶ 146-153, PageID.42-43.)  More specifically, the City says that "[t]he Census Bureau's adaptation of policies that benefit newer, wealthier areas to the detriment of older, less affluent cities has caused a reduction in the levels of federal funding, benefits, and other sources to which the City of Detroit and its Black and Hispanic residents are entitled." (*Id.* at ¶ 150, PageID.42.)

As relief, among other things, the City requests that the Court:

> 1. Hold unlawful and set aside the [Census] Bureau's policy of treating the demolition of vacant, uninhabitable structures in Detroit as evidence of population loss;
>
> 2. Hold unlawful and set aside the [Census] Bureau's refusal to accept evidence of both permitted and non-permitted construction of new inhabitable housing units in Detroit as part of the City's administrative challenge to the population estimates;
>
> 3. Hold unlawful and set aside the [Census] Bureau's application of the [County Control Rule];
>
> 4. Issue an Order compelling the Census Bureau to accept the verifiable and reliable data submitted by the City as

part of its administrative challenge to the population estimates; [and]

5. Declare that Defendants' intentional refusal to correct the racially-biased undercount of Detroit's population in the annual population estimates negatively and disproportionately affects the count of the City and results in actual discrimination against Detroit's Black and Hispanic residents.

(*Id.*, PageID.43.)

**F**

Following the filing of the Complaint, the parties engaged in an intensive effort to resolve their dispute. That process was partially successful. The Census Bureau carefully considered the City's arguments and agreed to change some of its methodologies that were at issue in the Abandoned Home Challenge and the Housing Permit Challenge. (*See* Aug. 12, 2024 Ltr., ECF No. 33-2.) It also agreed to again revise the City's population estimates. (*See id.*) Based on that agreement, the City dismissed Counts I and II of its Complaint – the Counts based upon the Abandoned Home Challenge and the Housing Permit Challenge. (*See* Stipulated Order, ECF No. 31.) The Abandoned Home Challenge and Housing Permit Challenge are therefore no longer part of this case. However, the parties were not able to resolve their differences with respect to the application of the County Control Rule or the County Control Challenge.

14

Thus, the remaining two claims in this case are: (1) the City's APA claim in Count III that the Defendants acted arbitrary and capriciously when they adopted and applied the County Control Rule and (2) the City's claim in Count IV that the Defendants violated the Due Process Clause when they adopted and applied the County Control Rule.  As relief for those remaining Counts, the City now asks the Court to "enter an Order (1) holding unlawful and setting aside the Census Bureau's application of the County Control Rule as to the Bureau's annual population estimates for Detroit, and (2) declaring that Defendants' intentional refusal to correct the racially-biased undercount of Detroit's population in the Census Bureau's annual population estimates violates the Fifth Amendment's guarantee of Equal Protection." (Mot., ECF No. 50, PageID.3511.)

## II

Before turning to the merits of the City's claims, the Court must first consider a preliminary argument that the Defendants have raised: that the City has failed to carry its burden to establish that it has Article III standing. (*See* Mot., ECF No. 32, PageID.3149-3155; Renewed Mot., ECF No. 59.)  For the reasons explained below, the Court concludes that the City has established standing.

## A

Federal courts are courts of limited jurisdiction. As the United States Court of Appeals for the Sixth Circuit has explained:

> The threshold question in every federal case is whether the court has the judicial power to entertain the suit. Article III of the United States Constitution prescribes that federal courts may exercise jurisdiction only where an actual 'case or controversy' exists. *See* U.S. Const. art. III, § 2. Courts have explained the 'case or controversy' requirement through a series of 'justiciability doctrines,' including, 'perhaps the most important,' that a litigant must have 'standing' to invoke the jurisdiction of the federal courts.

*Parsons v. U.S. Dep't of Just.*, 801 F.3d 701, 709 (6th Cir. 2015) (internal quotation marks and citations omitted).

As the party invoking federal jurisdiction, the plaintiff bears the burden of establishing standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). A plaintiff "must have standing for each claim pursued in federal court." *Parsons*, 801 F.3d at 710 (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)). "To satisfy the 'irreducible minimum of standing,' the plaintiff must establish that: (1) he has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent rather than conjectural or hypothetical; (2) that there is a causal connection between the injury and the defendant's alleged wrongdoing; and (3) that the injury can likely be redressed." *Lyshe v. Levy*, 854 F.3d 855, 857 (6th Cir. 2017) (quoting *Lujan*, 504 U.S. at 560–61). "[A]t the summary judgment stage," in order to withstand a defendant's motion attacking standing, "a plaintiff must only 'set forth by affidavit or other evidence specific facts [supporting standing] which for purposes of the summary judgment motion will be taken as true." *Am. C.L. Union*

16

*of Ohio Found., Inc. v. DeWeese*, 633 F.3d 424 430 (6th Cir. 2011) (quoting *Lujan*, 504 U.S. at 561). *See also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412 (2013).

**B**

The Defendants first raised their standing challenge in their initial motion for summary judgment. (*See* Mot., ECF No. 32.) The Court held a hearing on that motion on December 5, 2024. (*See* 12/5/2024 Hr'g Tr., ECF No. 40.) At the conclusion of the hearing, the Court told the parties that because the City relied exclusively on the allegations in its Complaint, "the current record" at that time "was not sufficient to carry the City's burden on standing." (*Id.*, PageID.3478.) The Court explained that in order to establish standing, the City needed to present "*evidence* showing that these alleged undercounts actually impacted [the City's] funding and that the remedy that the City seeks would actually impact [that] funding." (*Id.*; emphasis added.) The Court then gave the City an opportunity to develop that evidence. (*See id.*) The Court instructed the parties to engage in a limited period of discovery on the standing issue, and it told the parties that they could file renewed cross-motions for summary judgment and supplemental briefs addressing standing. Both parties then engaged experts and filed their renewed motions. (*See* Mots., ECF Nos. 50, 59.) As those motions were being filed, the Court held status conferences with the parties to discuss the motions. The Court offered to hold an evidentiary

17

hearing during which the Defendants could test the reliability and credibility of the City's experts. Defendants declined that offer.

The Court held a hearing on the motions on March 12, 2026. (*See* 3/12/2026 Hr'g Tr., ECF No. 62.) During that hearing, the Defendants confirmed that they had not brought a challenge to the City's experts under Federal Rule of Civil Procedure 702 or *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). (*See id.*, PageID.4633.)

## C

In *City of Detroit v. Franklin*, 4 F.3d 1367 (6th Cir. 1993), the Sixth Circuit explained that a city has standing to challenge the Census Bureau's methodology "based upon [a] claim that [a] census undercount will result in a loss of federal funds." *Id.* at 1374.[3] That is because "although 'the Census Bureau and the Department of Commerce are not in charge of distribution of federal funds, the Bureau's actions significantly affect the distribution of funds and therefore satisfies the requirements for injury in fact.'" *Id.* (quoting *State of Texas v. Mosbacher*, 783 F.Supp. 308 (S.D. Texas 1992)). *See also New York v. Dep't of Commerce*, 351 F.Supp.3d 502, 608 (S.D.N.Y. 2019) (explaining that "a loss of funding from federal

---

[3] The court in *Franklin* appeared to hold that a plaintiff's *allegations* that an undercount would result in a loss of federal funds was sufficient to establish standing. But as the Court explained above, based on the Supreme Court's holding in *Lujan*, and its subsequent decision in *Clapper*, a party cannot rest on its allegations alone and must present *evidence* to support Article III standing.

18

programs that distribute such funding on the basis of census data … is a classic form of Article III injury in fact" and holding that states had standing to bring claims arising out of the loss of those federal funds against the Commerce Department), *aff'd in relevant part and rev'd in part*, 588 U.S. 752 (2019).

Here, the City has presented evidence that application of the County Control Rule has caused it to lose federal funds. That evidence came from Dr. David Swanson, Distinguished Professor Emeritus of Sociology at the University of California Riverside. (*See* Swanson Rpt., ECF No. 50-3, PageID.3600.) Dr. Swanson also "served as a member of the U. S. Census Bureau's Scientific Advisory Committee for six years (2004-10)." (*Id.*) Dr. Swanson first explained that in order to reconcile the population estimates for the City and Wayne County, the Census Bureau applied a rake factor that decreased the 2023 population estimate for the City by over 25,000 people:

> The population estimates for the city of Detroit were reduced because of the … methodology used by the Census Bureau. According to the Census Bureau's 2023 derivation sheet, the sum of the city and town estimates within Wayne county, Michigan was four percent higher than the county population estimate to which it was controlled. The [resulting] process reduced Detroit's population (relative to the Housing Unit method) by 25,544 people. This number is derived by taking the difference between the uncontrolled household population produced by the housing unit method … and the application of county controls based on the county cohort component population estimate.

(*Id.*, PageID.3605-3606; internal citations omitted).  Dr. Swanson then provided two specific examples of federally-funded programs that would have awarded the City substantially more money had the rake factor not been applied to decrease the City's population estimate:

> According to the [Department of Education's] Title II funding formula, an increase of 25,544 people to the City's population estimate would result in an additional $421,515 annually to the Detroit Public Schools; and
>
> The addition of 25,544 people to the City's population estimate would produce an annual increase of $113,756 in its [Department of Housing and Urban Development] HOME Investment Partnerships Program funding allocation.

(*Id.*, PageID.3624.)  Finally, Dr. Swanson explained that even if the rake factor was eliminated entirely – and not applied anywhere in the country – the City would still see a substantial increase in its award of federal funds:

> A net positive change to the funding allocations to Detroit for the programs discussed in this report should still occur if the application of a rake factor to control subcounty population estimates was discontinued in all areas, not just Wayne county. [….] That is, because the use of IRS data to estimate net domestic migration rates results in overestimates of population loss in lower income counties (like Wayne county) more than in higher income counties, the effect of a widespread elimination of a rake factor to control subcounty population estimates would be expected to result in a net positive change to funding allocations for cities which, like Detroit, are in lower income counties.

(*Id.*, PageID.3623.)

20

The Court concludes that Dr. Swanson's opinion evidence is sufficient to satisfy the City's burden at the summary judgment stage to show that the Defendants' methodology has resulted in a loss of federal funds to the City. *See Am. C.L. Union of Ohio Found., Inc.*, 633 F.3d at 430.  Therefore, Defendants are not entitled to summary judgment based upon their contention that the City lacks Article III standing to challenge the application of the County Control Rule. *See Franklin*, 4 F.3d at 1374; *New York* 351 F.Supp.3d at 608.

**D**

Defendants disagree that Dr. Swanson's opinion evidence suffices to withstand summary judgment on standing grounds.  But they have failed to persuade the Court that his opinion evidence falls short.

**1**

The Defendants primarily argue that Dr. Swanson's opinions fail to establish the City's standing because Dr. Swanson "picked the wrong year" when conducting his analysis. (Mot., ECF No. 59, PageID.3885.)  Defendants argue that "this lawsuit challenges the Vintage 2021 and Vintage 2022 population estimates for the City of Detroit" (*id.*), but "Dr. Swanson [did not] rel[y] on data for 2021 or 2022 in [his] report[]." (*Id.*, PageID.3886.)  Instead, Dr. Swanson's report "focused on 2023 data alone." (*Id.*)  Thus, Defendants say, because the City's evidence comes solely from

21

2023, the City has failed to present any evidence that it has standing to challenge the population estimates from 2021 and 2022.

The Court disagrees.  When asked directly at his deposition, Dr. Swanson said that his conclusion that the City would have received more in federal funding in 2023 if the County Control Rule did not exist, also applied to both 2021 and 2022:

> Q: In your report, you give the specific example and provide detail regarding 2023. And for 2023, you calculate to specific dollar numbers the impact of the elimination of the county control. You don't do that for 2021, 2022, or 2024. Do you have -- and can you infer from your opinion any conclusions regarding 2021, 2022, or 2024?
>
> A. Well, given the data for the first two years are there, I think the substantive results would be very similar to what I found for Detroit. And when the 2024 data are available, I would expect the same thing there.
>
> Q. Okay. And while you can't tell us a specific dollar number, *is it your opinion that in 2022 if -- if for 2022 the county control were not in effect, the City of Detroit would have received more revenue from both the Title II Program and the HOME Program*?
>
> A. *Yes*.
>
> Q. *And the same for 2021*?
>
> A. *Yes*.

(Swanson Dep. at 209, ECF No. 59-4; emphasis added.)

During a status conference held on May 15, 2026, the Defendants countered that the Court should not rely upon this testimony because it does not rest on a

reliable methodology.  However, as noted above, Defendants did not bring a motion to exclude any of Dr. Swanson's opinions under Federal Rule of Evidence 702 or *Daubert*, and the Court declines to permit Defendants to raise such a challenge now – when briefing on the competing summary judgment motions is complete and given that the City would not have a full opportunity to respond.  Moreover, Defendants have not persuaded the Court that Dr. Swanson's opinions about 2021 and 2022 – which rest upon his 2023 analysis and his substantial experience in population science matters – lack a reliable foundation.  On the contrary, it appears to the Court that Dr. Swanson did have a reasonable basis to extrapolate from his opinions about the 2023 estimate to the 2021 and 2022 estimates.  For these reasons, the Court declines to discard Dr. Swanson's opinions addressing 2021 and 2022 based upon the Defendants' belated *Daubert*-like challenge.[4]

**2**

Defendants further counter that the City has failed to establish standing because it has "ignore[d] effects" removing the County Control Rule would have "on other jurisdictions." (Mot., ECF No. 59, PageID.3875.)  Defendants explain that there are "many low-income counties like Wayne County" throughout the country,

---

[4] The City has also argued that it would have standing even if Dr. Swanson did not offer any opinions specifically tied to 2021 or 2022.  This alternative argument rests upon the City's contention that its claims are not strictly limited to challenging the 2021 or 2022 population estimates. The Court need not, and does not, reach this alternative argument.

23

and Defendants say that the City has not shown that if the County Control Rule were eliminated nationwide, Wayne County (or the City) would actually see any increase in federal funds:

> There are many low-income counties like Wayne County—everywhere from El Paso County, Texas to Shelby County, Tennessee, to Bronx County, New York. *See* Morenoff Report at 38-41 (Appendix C). So even if [the City] had conclusively demonstrated that the average low-income county differs from the average high-income county in the relevant sense, that doesn't address (let alone answer) the question of how low-income counties differ from each other (much less Wayne County, in particular). And there remains zero evidence in the record to suggest that Wayne County would do better (or worse) than El Paso County or Shelby County or Bronx County or any of the many other low-income counties, in the absence of the county control. So there is likewise no basis to conclude that Detroit would get more federal funding if it won this suit. And in fact, Detroit might do worse—if, for example, the concerns raised by Detroit in this lawsuit about undercounts in low-income cities with high minority populations are similar (or even more pronounced) in other low-income cities with high minority populations.

(*Id.*, PageID.3878.)

But as noted above, the City *has* presented evidence that if the County Control Rule were eliminated nationwide, the City would still receive more federal funds than it did in 2021 and 2022.  In his expert report, Dr. Swanson opined that "[a] net positive change to the funding allocations to Detroit for the programs discussed in this report should still occur *if the application of a rake factor to control subcounty*

24

*population estimates was discontinued in all areas*, not just Wayne county."

(Swanson Rpt., ECF No. 50-3, PageID.3623; emphasis added.)

Defendants respond that the Court should reject this opinion of Dr. Swanson because (1) "is entirely parasitic" of the opinion of a second expert that the City presented, Dr. Jeffrey Morenoff, and (2) Dr. Morenoff's opinion suffers from several fatal flaws. (Mot., ECF No. 59, PageID.3880.)  That argument fails for at least two reasons.

First, that argument, like Defendants' above-described attack on Dr. Swanson's other opinions, is effectively a *Daubert* challenge that comes too late. For the same reasons that the Court declined to consider Defendants' other belated *Daubert*-like challenge, the Court declines to consider this one.

Second (and much more importantly), Defendants err when they describe Dr. Swanson's opinion as based entirely upon Dr. Morenoff's allegedly-flawed work. Dr. Swanson testified that his opinion that the City would receive more in federal funds if the County Control Rule were eliminated nationwide was "largely based on [his] own experience," not Dr. Morenoff's opinions:

> Q. This page, the first sentence starts, "A net positive change to the funding allocations to Detroit for the programs discussed in this report should still occur if the application of a rake factor to control Sub-County population estimates was discontinued in all areas, not just Wayne County. [....] What is the basis of that statement?

25

A. Well, it's partly on what I said before, I didn't -- I didn't cite necessarily the final report that Dr. Morenoff continued, but I saw drafts of it. And what I checked when I went back and looked at it were the sections of it that he made this discussion. So part of it is based on his analysis of the Census Bureau's reliance on IRS data to estimate the rate of net domestic migration. And at least overestimates of population loss in lower income Counties, et cetera, et cetera.

Q. Is -- is that statement in that first sentence based on anything else other than Dr. Morenoff's report?

A. It's based on the fact that if that was eliminated, I don't think I would expect to see huge differences. Some differences, yes, but not substantively differences if a rake factor was -- was eliminated around the entire country. And that -- *that's largely based on my experience in dealing with demographic estimation, and the amount that I have dealt with control factors*. It looks to me like in general these same kind of issues would apply to Detroit specifically if it was eliminated nationwide.

(Swanson Dep. at 163-165, ECF No. 59-4; emphasis added. *See also id.* at 171-172.)

Given this testimony, Defendants miss the mark when they argue that Dr. Swanson's

opinion must be excluded because it rests upon Dr. Morenoff's opinions.

**E**

For all of these reasons, the Court concludes that Defendants are not entitled

to summary judgment on the basis that the City lacks Article III standing. The Court

will now proceed to review the City's remaining two claims on their merits.[5]

---

[5] The parties raised their arguments on the merits in their summary judgment motions located at docket numbers 32 and 33.

26

# III

The Court first turns to the City's claim that the Defendants violated the APA when they adopted the County Control Rule.  Once again, in that claim, the City contends that the Census Bureau acted arbitrarily and capriciously when it adopted the County Control Rule –  under which the Bureau conforms municipal population estimates (developed using the housing-unit method) to county population estimates (developed using the ADREC method).  The Court concludes that Defendants are entitled to summary judgment on that claim.

## A

As the City concedes, to succeed on its APA challenge to the County Control Rule, it must show that the Census Bureau's adoption of that rule was "arbitrary and capricious." (Mot., ECF No. 33, PageID.3201.)  "When determining whether a final agency action is arbitrary or capricious, the scope of [a court's] review is an extremely narrow one." *Oakbrook Land Holdings, LLC v. Comm'r of Internal Revenue*, 28 F.4th 700, 720 (6th Cir. 2022) (internal citation omitted). *See also Hosseini v. Nielsen*, 911 F.3d 366, 371 (6th Cir. 2018) (same).  Agency action satisfies this standard where the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up).  Said

27

another way, an agency action is arbitrary or capricious where it "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* In addition, where, as here, the agency's action is based upon its "technical or scientific evaluations and determinations, the highest level of deference to the agency is to be applied." *Citizens Coal Council v. U.S. E.P.A.*, 447 F.3d 879, 890 (6th Cir. 2006). *Cf. Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983) (explaining that "[w]hen examining" "determination[s]" that are "within [the] area of special expertise" of a government agency, "a reviewing court must generally be at its most deferential"). Thus, the Court must "look at the agency's decision not as … the statistician that [it is] qualified neither by training nor experience to be, but as a reviewing court exercising [its] narrowly defined duty of holding agencies to certain minimal standards of rationality." *State of Mich. v. Thomas*, 805 F.2d 176, 182 (6th Cir. 1986).[6]

---

[6] The Court's analysis here is not affected by the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024). *Loper Bright* addressed the "resolution of *statutory* ambiguities" and the amount of deference (if any) that a federal agency receives when it resolves such a statutory ambiguity. *See id.* at 374 (emphasis added). But this case does not involve the Census Bureau's interpretation of a statute. Instead, this case concerns methodologies for estimating populations that the Census Bureau has implemented. Thus, *Loper Bright* does not apply here. *See, e.g., Reeder v. United States*, No. 24-cv-00227, 2024 WL 3912751, at * 7 (D.N.M. Aug. 23, 2024) ("While *Loper Bright* did overturn judicial deference to an agency's reasonable interpretation of an ambiguous statute, it did not overturn the APA's 'mandate that judicial review of agency policymaking and factfinding be deferential.'") (quoting *Loper Bright*, 603 U.S. at 392), *vacated upon settlement*, 2024 WL 6838737 (D.N.M. Nov. 26, 2024).

Finally, when reviewing the Defendants' administrative actions here, the Court's review is "limited to reviewing the administrative record to determine whether there exists a rational connection between the facts found and the choice made." *ECM BioFilms, Inc. v. FTC*, 851 F.3d 599, 612 (6th Cir. 2017) (cleaned up). As the Supreme Court has explained, "[i]n applying the [arbitrary and capricious] standard, the focal point for judicial review should be the administrative record already in existence and not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). *See also Resolute Forest Prods., Inc. v. U.S. Dept. of Agric.*, 187 F.Supp.3d 100, 106 (D.D.C. 2016) (explaining that "in APA cases, the function of the district court is to determine whether or not the evidence in the administrative record permitted the agency to make the decision it did") (internal punctuation omitted).

**B**

The Census Bureau's adoption and application of the County Control Rule was neither arbitrary nor capricious because the Bureau could rationally have concluded that adjusting the municipal population estimates to match the county-level estimates actually enhanced the accuracy of the municipal estimates. More specifically, as Defendants have demonstrated, the administrative record contains evidence suggesting that the ADREC method used to estimate county-level populations, although imperfect, is more accurate than the housing-unit

29

methodology used to calculate municipal populations, and in light of that evidence, the Census Bureau reasonably could have decided that conforming the municipal population estimates to the county-level estimates improved the municipal population estimates.

The evidence in the administrative record suggesting that the ADREC method for estimating county populations is more accurate than the housing-unit method used to estimate municipal populations includes the following:

- A June 17, 2008, research paper titled "Summary of Findings from the Housing-Unit Based Estimates Research Team" at the Census Bureau that concluded that: "Results indicate that the currently used ADREC method provides population estimates for the county level that are closer to census counts (considered 'truth' in this case) than the estimates developed using a housing unit-based method." (Admin R., ECF No. 20, PageID.1700.)

- January 3, 2013, responses from the Census Bureau to public comments that were published in the Federal Register.  In those responses, the Census Bureau explained that "[t]he ADREC method consistently produced county-level estimates closer to the 2010 Census results, whereas the housing unit based population estimates were upwardly biased." (Admin R., ECF No. 21, PageID.2137.)  The Census Bureau further explained that "[d]uring [a] temporary suspension of the Population Estimates [Challenge

Program]" put in place due to the COVID-19 pandemic, the Census Bureau used that additional time to "evaluat[e] the 2010 population estimates and the methods used to create them. […] As part of this process, the Census Bureau assessed the county-level population estimates produced with the ADREC and housing unit methods against the 2010 Census results." (*Id.*) The Census Bureau concluded based on that comparison that "[i]t was clear that the best overall and defensible approach to estimation of county-level governmental units was through the ADREC method. In addition, it also became clear that the employment of a variation on the housing unit based method generally produced estimates that were more biased than the ADREC method when compared to the 2010 Census results. The evaluations also did not identify a clear-cut means to determine for any given county or equivalent when a housing unit method would yield a more accurate estimate than that produced by the ADREC method." (*Id.*)

- A paper titled "Housing-Unit Method in Comparison: The Virginia Case," published by the University of Virginia Weldon Cooper Center for Public Service, as part of the Census Bureau's Housing Unit-Based Estimates Research Team, concluding that based on a 2007 study of the housing-unit method in Virginia, "[t]he housing unit method typically produce[d] overestimate[s]" of a city's population and that "using an independently-

31

produced control total to rake the [housing-unit]-based estimates [was] necessary and improves accuracy." (*Id.*, PageID.2236); and

- A July 2013 paper by the Population Division of the Census Bureau titled "Evaluating Current and Alternative Methods to Produce 2010 County Population Estimates" which concluded that "the use of the housing unit method results in estimates that are considerably less accurate than the ADREC method estimates." (Admin R., ECF No. 22, PageID.2288.)

The City has not identified evidence in the administrative record that meaningfully undermines or contradicts this evidence. Indeed, the City cites only one piece of evidence from the administrative record that calls into question the accuracy of the ADREC method. That evidence is a statement from Patty Becker, the former Executive Director of the Southeast Michigan Census Council, who was speaking at an open-to-the-public seminar that the Census Bureau held in 2008. (*See* Admin R., ECF No. 20, PageID.1840.) In that statement, Becker said that one component of the ADREC method – its reliance on income tax filings to estimate migration rates between counties – was flawed because "[p]eople with low incomes are less likely to file returns and are also less likely to move. The differential ended up being something like 28 percent in the migration rate between filers and non-filers." (*Id.*)

32

For at least two reasons, the Census Bureau could rationally have concluded that Becker's statement did not warrant discarding either the ADREC method or the County Control Rule.  First, Becker, herself, acknowledged that her opinion was based on "a challenge to the Census Bureau's estimates for the City of Detroit" that she pursued on the City's behalf nearly 40 years ago in 1986. (*Id.*, PageID.1840-1841.)  Thus, the Census Bureau could reasonably have questioned the continuing validity of her contention.  Second (and more importantly), the Census Bureau could fairly have discounted Becker's statement on the ground that it fails to acknowledge that the ADREC method relies on far more than tax filing data to estimate county populations.  As Defendants have pointed out, the ADREC method also uses "several other important sources of data, like birth certificates, death certificates, Medicare enrollment data, Social Security Administration data" and other population data when reaching its county-level population estimates. (Resp., ECF No. 34, PageID.3258, citing Admin R., ECF No. 23, PageID.2583. *See also* Admin R., ECF No. 23, PageID. 2581-2582.)

Moreover, while the Census Bureau has adhered to the ADREC method for estimating county populations, it has acknowledged that the use of tax filing data as one component of that method does have certain shortcomings. (*See* Admin. R., ECF No. 23, PageID.2583.)  That is precisely why the Census Bureau does not rely solely on the tax filing data – and why it utilizes the several other types of data identified

33

above – when applying the ADREC method to determine county-level populations. (*See id*.)  That the Census Bureau candidly acknowledged – and then sought to address – the imperfections in the ADREC method further confirms that the Bureau did not act arbitrarily or capriciously when it adopted the County Control Rule and decided to conform municipal populations to county populations (estimated through the ADREC method).

For all of these reasons, Defendants are entitled to summary judgment on the City's APA claim challenging the County Control Rule.

## C

Before turning to the City's equal protection claim, the Court pauses to make one final point concerning the City's APA challenge to the County Control Rule and its reliance on the ADREC method.  While the Court rejects that challenge, the Court has *not* concluded that applying the County Control Rule leads to the most accurate population estimate for cities like Detroit or is more accurate than the housing unit method favored by the City.  Indeed, the City has presented many reasonable criticisms of the County Control Rule.  But the Court's job here is not to pick between the two methodologies or to reach a definitive conclusion about which methodology is better or more accurate.  "[I]nstead," the Court's narrow task is to "determine simply whether the [County Control Rule] had a rational basis and took into consideration the relevant factors." *Comm. to Pres. Boomer Lake Park v. Dep't*

*of Transp.*, 4 F.3d 1543, 1553 (10th Cir. 1993).  It did.  Therefore, the Court must uphold the Census Bureau's application of the rule.

## IV

The Court next turns to the City's claim in Count IV of its Complaint that the adoption of the County Control Rule violated its right to equal protection under the Due Process Clause of the Fifth Amendment.  In order to succeed on that claim, the City must present "[p]roof of racially discriminatory *intent or purpose*." *Vill. of Arlington Heights v. Metro Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) (emphasis added).  Thus, the City must show that the County Control Rule was "promulgated … *because of*, not merely in spite of, its adverse impact" on racial minorities living in the City. *Horner v. Ky. High Sch. Athletic Ass'n*, 43 F.3d 265, 276 (6th Cir. 1994).

The City has not come close to meeting that standard here.  While the City argues that the "Census Bureau's methods constantly undercount Black and Hispanic populations" (Mot., ECF No. 33, PageID.3215), the City has not shown that the Census Bureau adopted the County Control Rule *because of* the racial makeup of the City and/or with the intent to discriminate against the City's minority residents.  Even if the Court accepted as true the City's contention that "[t]he County Control Rule has a disproportionate and discriminatory impact on Detroit's Black and Hispanic residents," that would not be enough to succeed on the City's equal protection claim.  That is because "[e]ven if a neutral law has a disproportionally

35

adverse effect upon a racial minority, it is unconstitutional under the Equal Protection Clause *only if* that impact can be traced to a discriminatory purpose." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979) (emphasis added). *See also Vill. of Arlington Heights*, 429 U.S. at 264–65 ("[O]fficial action will not be held unconstitutional solely because it results in a racially disproportionate impact"). Because the City has not identified any evidence that the County Control Rule was adopted with a racially discriminatory purpose, the Defendants are entitled to summary judgment on that claim.

## V

For all of the reasons explained above, the Defendants' motion for summary judgment (ECF No. 59) is **GRANTED** and the City's motion for summary judgment (ECF No. 50) is **DENIED**.

**IT IS SO ORDERED.**

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  June 10, 2026

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on June 10, 2026, by electronic means and/or ordinary mail.

s/Holly A. Ryan
Case Manager
(313) 234-5126

36